# United States Court of Appeals
## For the First Circuit

Nos. 13-1240, 13-1285

ISMAIL OZGUR YAMAN,

Petitioner-Appellant/Cross-Appellee,

v.

LINDA MARGHERITA YAMAN, a/k/a LINDA MARGHERITA POLIZZI,

Respondent-Appellee/Cross-Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Kayatta, Circuit Judges.

Douglas E. Brayley and Daniel V. Ward, with whom Christopher
G. Green, Donna A. Mizrahi, Allison Boscarine, and Ropes & Gray LLP
were on brief, for petitioner.
Susan Kim, with whom Donald J. Marchesseault, Janice Howe,
Beth I.Z. Boland, Stephen Jacob Quinlan, Caleb Schillinger, and
Bingham McCutchen LLP were on brief, for respondent.

September 11, 2013

**LYNCH, Chief Judge**.  The district court denied the petition of Ismail Ozgur Yaman ("Yaman") for return of his two daughters, E.Y., now 10, and K.Y., now 11, to Turkey, pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, reprinted in 51 Fed. Reg. 10,494 (Mar. 26, 1986) ("Convention").

The two children have lived with their mother since 2004, having lived with their mother and their father before that.  The mother and two children have lived in the United States since April 2010, and in New Hampshire since May 2010.  There is no question that the habitual residence of the children was Turkey, that Yaman had been given custody of the children by the Turkish courts, that their American mother, Linda Margherita Yaman, a/k/a Linda Margherita Polizzi ("Polizzi"),[1] wrongfully removed the children in 2007 and then hid them, and that this prevented Yaman from locating them and filing his petition for return until he recently found them.

The mother, Polizzi, argued against return, asserting substantively different defenses: (1) under Article 12 of the Convention, that the children were "now settled" in the United States and so could not be returned; and (2) under Article 13, that the father had sexually abused his elder daughter (a claim rejected

_____

[1] For the purpose of keeping the two parties clear, we refer to the mother as "Polizzi."  Yaman has remarried, and his second wife is "Ms. Yaman."

by the Turkish courts), and so return would pose a "grave risk" to the children. Yaman has appealed, and we have expedited the appeal, as required by the Convention. Id. art. 2.

In a carefully reasoned analysis, the district judge concluded that neither equitable tolling nor equitable estoppel applied to bar the mother from asserting the "now settled" defense and concluded the children were "now settled." It held that it had no authority under Article 12, then, to order the return of the children under the Convention. In an alternate holding, it concluded that if it did have authority nonetheless to order return, it would not order return, based on the facts.

The district court also rejected the claims of sexual abuse under Article 13. Both parents appeal from those portions of the findings adverse to them.

As to the rejection of the Article 13 defense raised by the mother's cross appeal, we hold that the district court committed no error of law and that its conclusions are well supported by the evidence. We reject the cross-appeal.

The Article 12 issues are serious and present issues of first impression for us. Article 12 of the Convention provides that "[w]here a child has been wrongfully removed" from one contracting state to another or wrongfully retained in a contracting state and, at the date of the commencement of judicial proceedings, "a period of less than one year has elapsed" from the

date of the wrongful removal or retention, the child shall be "return[ed]" "forthwith." Convention, art. 12. The Convention further provides that "even where the proceedings have been commenced after the expiration of the period of one year," the court "shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment." Id.

The questions presented by the father's appeal are as follows:

> (1)  Whether equitable tolling applies to the one-year period that triggers the availability of the "now settled" defense under Article 12.

> (2)  Whether, as a matter of law, the conclusion that the child is "now settled" under Article 12 precludes a court from ordering return.

We hold that the Convention does not allow a federal district court to toll equitably the one-year period that must elapse before a parent can assert the "now settled" defense. In so doing, we join the Second Circuit, see Lozano v. Alvarez, 697 F.3d 41, 51 (2d Cir. 2012), cert. granted in part, 133 S. Ct. 2851 (2013), and differ from the Ninth and Eleventh Circuits, see Duarte v. Bardales, 526 F.3d 563, 570 (9th Cir. 2008); Furnes v. Reeves, 362 F.3d 702, 723-24 (11th Cir. 2004). The Supreme Court has granted certiorari as to this first question. Lozano v. Alvarez, 133 S. Ct. 2851 (2013).

We also hold that the Convention does not prevent the district court from ordering the return of "now settled" children, and the court erred in holding otherwise. The court, at that point, should analyze the return question under principles of equity consistent with the Convention's purposes, an analysis it undertook in its alternative holding. We review the alternative holding under an abuse of discretion standard, and find none.

I.

A.      Factual Background

Yaman and Polizzi met in 1997 when Yaman, a native and citizen of Turkey, was a graduate student at Wayne State University in Detroit, Michigan. The two were married in August 2000 in Turkey, and then returned to the United States.

Their first child, K.Y., was born in the United States on March 5, 2002. Shortly thereafter, Yaman received a teaching appointment at the Middle East Technical University in Turkey. The family moved to Turkey. Both Polizzi and the child obtained dual United States/Turkish citizenship. The couple's second child, E.Y., was born in Turkey on August 11, 2003, and is also a citizen of the United States and Turkey.

Yaman and Polizzi began to have marital difficulties sometime in 2004. In December 2004, Yaman and Polizzi separated. Yaman moved out of the family home; the two children remained with Polizzi.

In February 2005, Yaman filed for divorce in Turkish Family Court; Polizzi filed counter-suit in March 2005. The children continued to live with the mother during the course of the divorce proceedings. On March 13, 2006, the Family Court issued an order granting Yaman <u>sole</u> custody of the two children. Polizzi appealed to the Turkish Supreme Court of Appeals. During the pendency of that appeal, the children continued to stay with the mother.

On April 3, 2007, the Turkish Supreme Court of Appeals upheld the decision of the Family Court awarding sole custody of the two children to Yaman. Polizzi appealed that decision as well. The Supreme Court of Appeals issued a second decision affirming the judgment of the Family Court on July 16, 2007. On August 3, 2007, the Family Court entered its final ruling, finalizing the order awarding Yaman sole custody, consistent with the decision of the Supreme Court of Appeals.

Without notice to the father or the court, Polizzi left Turkey with the children by boat in August 2007. For help in escaping Turkey, Polizzi purchased the services of a self-proclaimed child "snatch-back" specialist. Polizzi and the children first travelled to Athens, Greece.[2] Polizzi continued to

---

[2] At that point, Polizzi attempted to procure passports for the two children at the United States Consulate. The Consulate informed Polizzi that it was aware of the Turkish Family Court's order awarding sole custody of the two children to Yaman, and, accordingly, refused to waive the requirement that both parents

-6-

travel with the two children through several European countries before arriving in Andorra. As Polizzi was aware, Andorra was and is not a signatory to the Convention. Polizzi remained in Andorra with the two children from October 2007 to April 2010. At no point did the mother inform the father of her or the children's whereabouts.

On May 22, 2009, Polizzi petitioned the United States Department of State to issue the two children passports, again seeking a waiver of the two-parent consent requirement. Polizzi refused to disclose her location to State Department officials. The State Department initially denied Polizzi's petition. It ultimately issued the children single-use, direct return passports to the United States, although it cautioned that it "does not and cannot condone" Polizzi's violation of the Turkish custody order.

Polizzi and the two children arrived in the United States in April 2010. Polizzi drove the children first to Michigan, and then to Missouri, before settling in New Hampshire in May 2010.

Around August 2007, Yaman asked a friend to look for the children at Polizzi's mother's home in Michigan. In January 2008, Yaman filed an application under the Convention with the Central Authority of Turkey, saying he believed the two children to be residing with Polizzi's parents in Michigan. In February 2008, the Central Authority contacted the United States Department of State.

consent to the issuance of passports to minors.

-7-

In January 2009, the State Department's Office of Children's Issues deactivated Yaman's application, believing that the children were in Europe, not the United States.  In April 2010, the State Department sent Yaman a letter informing him that the children had been issued passports for direct return to the United States. Yaman forwarded that letter to the Central Authority of Turkey.  On May 12, 2010, the Central Authority requested that the Office of Children's Issues reactivate Yaman's application.  After various attempts, the State Department finally located the mother and children in New Hampshire on December 19, 2011.  The State Department cautioned Yaman against filing a petition with a New Hampshire court before Polizzi's specific address could be confirmed, fearing that Polizzi might flee.  As of June 5, 2012, Polizzi's New Hampshire address was still unconfirmed.  Yaman decided to move forward with the Hague petition for return despite the lack of confirmation.

B.          Proceedings Before the District Court

On June 12, 2012, Yaman filed a petition in the District Court for the District of New Hampshire pursuant to Article 2 of the Convention and the International Child Abduction Remedies Act, 42 U.S.C. § 11601 et seq. ("ICARA"), requesting an order to return the two children to Turkey.  Yaman also requested provisional remedies to ensure that both Polizzi and the two children remained in New Hampshire throughout the course of the proceedings.  On June

15, 2012, the district court ordered provisional remedies and appointed a guardian ad litem to issue a report on the two children's behalf.

One month before the court's scheduled evidentiary hearing, Yaman filed a motion to preclude Polizzi from asserting the affirmative "now settled" defense under Article 12 of the Convention. Yaman argued that Polizzi "should not be permitted to avail herself of t[hat] defense where she has, for years, actively and egregiously attempted to evade legal proceedings." The district court denied the motion. Yaman v. Yaman, 919 F. Supp. 2d 189, 198 (D.N.H. 2013). In an order dated January 28, 2013, the district court explained that neither the text nor the drafting history of the Convention supported the argument that Article 12's one-year period was subject to equitable tolling. Id. at 192-93. Moreover, the district court observed, the Executive Branch had taken the position that equitable tolling does not apply. Id. at 193-96. Conceding that the Courts of Appeals were divided on the issue, the district court found the arguments in favor of the applicability of equitable tolling "unpersua[sive]." Id. at 196. Last, the district court noted that the judicial decisions of other signatory nations supported the proposition that Article 12's "now settled" defense does not equitably toll. Id. at 197.

On January 22, 2013, the district court commenced a three-day bench trial, which included evening hearings. The

district court heard testimony concerning, inter alia, the removal of the children from Turkey, as well as the mother's extensive efforts to conceal their location thereafter. Most of these allegations went uncontested. Yaman also testified as to his continuous attempts to locate the two children after they had been removed.

The court heard testimony from the mother about how settled the children were in the community, their friendships, their schooling, and her concealment of their location, among other things. The mother also gave testimony concerning her allegations of sexual abuse of the older daughter. Polizzi testified that, during a January 2004 visit to her family in the United States, her grandmother, then in her early 80s, thought she observed Yaman massaging K.Y.'s clitoris while changing her diaper. Three months later, Polizzi's grandmother shared this with Polizzi's mother, who then relayed the incident to Polizzi. Polizzi's mother insisted that Polizzi leave Turkey and return with the children to the United States. At that point, Polizzi began to observe what she regarded as suspicious behavior by Yaman. She remarked that Yaman would sleep in a separate room with K.Y. when K.Y. would wake crying in the night. She claimed to have observed Yaman on numerous occasions with an erection when holding K.Y. She alleged that she asked K.Y. during a diaper change whether Yaman had "touched her pee-pee," to which K.Y. said yes. And she asserted

-10-

that K.Y. once said she did not want to go to her father because he had made a "raspberry" on her, i.e. made a red mark by blowing, gesturing at her genital area. Polizzi testified she had K.Y. evaluated by three different mental health experts in Turkey, one in Greece, and a pediatrician in the United States.

The court also heard testimony from the guardian ad litem for the children, who testified that his interviews with their teachers showed no red flags, and that other witnesses confirmed that the children were assimilating well. The guardian ad litem, after a thoughtful explanation, concluded the children were unable to provide a mature judgment about where they should live. The court also considered the guardian ad litem's formal report and those of experts concerning each of the children. The court heard testimony from experts for the respondent and the petitioner, who did not interview the children (the guardian ad litem had advised against it) but had reviewed documents including reports prepared by experts who had.[3] The respondent's psychiatric expert testified that the children were settled "in the way that one would use the word in a common sense." He also said he could not form an opinion that the children were or were not sexually abused. Similarly, the respondent's pediatric expert expressed a "concern" the children had been abused, but was unable to conclude with a reasonable

___

[3] As the district court noted, with one exception, discussed below, none of the expert reports concluded that abuse was more likely than not.

-11-

degree of medical certainty that they had. And likewise the petitioner's expert formed an opinion that he could not conclude to a reasonable degree of medical certainty that K.Y. was abused. He was also unable to conclude that K.Y. had not been sexually abused.

The father also testified consistently with all of the assertions in his petition. He denied any sexual abuse[4] and described the Turkish court's orders and his search for his missing daughters, including use of the Turkish and United States Central Authorities. Yaman's present wife, the mother of his son, also testified. Yaman put on no evidence as to the children's ability to resettle in Turkey.

The district court denied Yaman's petition in an oral order from the bench after trial. Yaman had made out his prima facie case for return, with Polizzi conceding both that she had removed the children in violation of Yaman's custody rights and that the children were habitually resident in Turkey immediately before they were removed. See Convention, art. 3. The district court also found that Polizzi had concealed the children after removal, and that Yaman had been diligent in his efforts to assert

---

[4] Yaman admitted to once having an erection when holding K.Y., and to Polizzi's confronting him on that occasion. Yaman attributed that incident to normal male physiology. He also admitted to making "raspberries" on K.Y.'s arms, back, etc., but insisted that he had never made a "raspberry" on her genital area.

his rights under the Convention.[5] The district court nevertheless denied the petition for return.

The district court rejected Polizzi's argument that, pursuant to Article 13 of the Convention, return should be refused because it would pose a "grave risk" of harm to the children. As to the specific incidents alleged, the district court held that it had received no admissible evidence regarding Polizzi's grandmother's alleged observation.[6] Moreover, the district court found, there was substantial reason to doubt the accuracy of the grandmother's report.[7] As to the other incidents alleged, the

---

[5] On cross-appeal, Polizzi challenges both of these findings, claiming (1) that she and the children lived openly in Andorra from October 2007 through April 2010 and in New Hampshire since May 2010; and (2) that Yaman could have made additional efforts to discover her and the children's location. This court reviews the district court's findings of fact for clear error. Whallon v. Lynn, 230 F.3d 450, 454 (1st Cir. 2000). Here, the evidence in the record provides overwhelming support for both findings. Polizzi engaged in substantial efforts to conceal her and the children's location, including refusing to respond to emails, refusing to disclose their location to the State Department, and, ultimately, moving to New Hampshire where the family had no prior ties. At the same time, Yaman was in continuous contact with Central Authorities in both Turkey and the United States. Yaman also sought assistance from Interpol and the Turkish police. As such, we agree with the district court that it is "ludicrous" for Polizzi to suggest either that she did not conceal the children or that Yaman slept on his rights under the Convention.

[6] The district court considered testimony from Polizzi about the incident for the limited purpose of explaining her actions going forward. Polizzi's grandmother was unable to testify as a result of her age (then 91).

[7] As the district court noted, Polizzi's grandmother's spouse had abused his children.

-13-

district court found that most admitted of benign explanations.
For instance, a father sleeping with a crying child was not unusual
behavior.[8]  The district court found more disconcerting Polizzi's
accusations concerning Yaman having multiple erections when holding
his daughter.  But, on that issue, the district court reasoned that
the one incident conceded by Yaman could be explained without
appeal to sexual arousal (e.g., morning erection), while Polizzi's
further accusations were not credible.

        As to the expert reports and testimony, the district
court observed that, with one "[un]persuasive" exception,[9] none of
the at least sixteen experts who evaluated the children or the
record was able to conclude that past abuse was more likely than
not.  This included the various Turkish experts who evaluated the
children closer in time to the alleged incidents.  While numerous

---

        [8] The district court noted that Yaman had only been accused of
sleeping with K.Y. when prompted by her crying in the middle of the
night.

        [9] The therapist who examined K.Y. in Greece in September 2007
was the lone expert willing to conclude that abuse had occurred.
The district court found the therapist's testimony
"[un]persuasive."  The therapist's finding of abuse was based upon
remarks by K.Y. concerning an alleged incident, previously
unreported, in 2007, a time at which Yaman only had contact with
the children during supervised visits.  Polizzi's only evidence of
abuse at trial pertained to incidents alleged to have occurred in
2004.  Moreover, the therapist's examination took place in a
situation where Polizzi needed, and was aware that she needed, the
examiner to find past abuse in order for Polizzi to secure
passports for return to the United States.  Last, the examination
took place after months of potential suggestion (e.g., Polizzi's
mother accused Yaman of abuse in front of K.Y.).  On this basis,
the district court found the therapist's testimony not credible.

experts had expressed "concern," the district court noted that there is always "concern" when a parent is accused of sexual abuse. The district court concluded that, in its best judgment, Polizzi's actions were ones of a "concerned but misguided mother." The district court noted that Polizzi was acting "under tremendous pressure" from her mother.[10]

The district court then found that the children were "now settled," applying the totality of the circumstances test articulated by the Ninth Circuit in Duarte, 526 F.3d at 576. The district court assigned particular weight to the guardian ad litem's testimony and report, describing it as "the best evidence on this point."

Having found that the children were "now settled," the district court went on to hold that, in light of this finding, it lacked discretion to order the children's return under the language of Article 12. The district court reasoned that the text of Article 12, when contrasted with the text of Articles 13 and 20, indicated that the drafters of the Convention intended that courts

---

[10] The district court also rejected Polizzi's argument that Yaman's father posed a "grave risk." The district court found that Polizzi had failed to show that past abuse by Yaman's father was more likely than not. Polizzi did not challenge that finding in her opening brief. Any argument that the district court committed clear error in reaching this finding is therefore waived. Even apart from waiver, the argument has no merit. Polizzi's evidence of past abuse by Yaman's father was scant. In addition, the district court found certain of Polizzi's accusations "[im]plausible." As such, the district court did not commit clear error in finding no past abuse by Yaman's father had occurred.

-15-

be required to refuse the return of a "now settled" child.  As to Article 18 of the Convention, which clarifies that the Convention's various provisions "do not limit the power of a judicial or administrative authority to order the return of the child at any time," Convention, art. 18, the district court reasoned that, although Article 18 "makes quite clear that the Convention does not in any way limit" a court's power to order return, a federal district court, unlike a state court, does not enjoy a general return power.  In reaching this conclusion, the district court relied heavily upon the drafting history of the Convention, which, it thought, indicated that its drafters envisioned Article 18 discretion as extending only so far as a court is able to entertain a decision on the merits.  Because a federal district court is sharply limited in its ability to consider the merits of a custody claim, the district court inferred that it lacked the general authority to remove to which Article 18 refers.

Recognizing the novelty of its sua sponte federal/state court distinction, the court went on to hold in the alternative that, even if it did have authority to order the return of a child "now settled," it would not exercise that authority here.  The district court articulated various considerations in favor of return, including the interest in a child's being "reunited with the parent . . . from whom [she] w[as] wrongfully removed," the interest in "effectively punish[ing]" Polizzi, and the interest in

-16-

"deter[ring] future clever abductors."   On the other hand, the district court observed, the two children were of such ages that "attachments in a community [we]re particularly important," remarking "[t]he settlement issue would not be nearly so big in my mind if they were 14 or 15 or if they were three and five." Moreover, the district court noted, although Polizzi had made efforts to conceal the children's location, it "s[aw] very little evidence that she did anything that would be damaging to the . . . children's psyche."  This was consistent with the district court's more general observation that Polizzi had "acted under a mistaken but well-intentioned belief" regarding the safety of the children. Lastly, the district court stated that punishing the mother would have, at best, a "very limited" deterrent effect.[11]  The district court expressed discomfort with rewarding the party "more at fault here," remarking that "[i]f it were just about which of these people should be rewarded or punished, if the children were chattel," it would award the children to Yaman.  But, the district court concluded, "children aren't chattel" and the Convention does not treat them as such.

_____

[11] As the district court noted, if it declined (as it did) to exercise supplemental jurisdiction over the state law claims, it would be without prejudice to Yaman's right to immediately petition the state court because the federal court would not have decided the merits of the state claim.  The district court did note that there would likely be collateral estoppel effects from its factual findings.

On February 14, 2013, Yaman filed a timely notice of appeal from the district court's denial of his petition. And, on May 3, 2013, Yaman filed in a New Hampshire state court a petition for expedited enforcement of the Turkish custody order, pursuant to the New Hampshire Uniform Child Custody Jurisdiction and Enforcement Act, N.H. Rev. Stat. Ann. § 458-A:29.

II.

"We review the district court's interpretation of the Hague Convention de novo," Danaipour v. McLarey, 286 F.3d 1, 13 (1st Cir. 2002) ("Danaipour I"); so too its application of the Convention to facts. Felder v. Wetzel, 696 F.3d 92, 98 (1st Cir. 2012). "We review the district court's factual findings for clear error . . . ." Whallon v. Lynn, 230 F.3d 450, 454 (1st Cir. 2000). And we review for abuse decisions left to the "sound discretion" of the district court. Kufner v. Kufner, 519 F.3d 33, 40 (1st Cir. 2008).

"The interpretation of a treaty, like the interpretation of a statute, begins with its text." Medellín v. Texas, 552 U.S. 491, 506 (2008). "[D]rafting history . . . may of course be consulted to elucidate a text that is ambiguous." Chan v. Korean Air Lines, Ltd., 490 U.S. 122, 134 (1989). We also take into account the signatories' intentions and expectations. See Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. 176, 180 (1982).

Importantly, "[i]t is well settled that the Executive Branch's interpretation of a treaty 'is entitled to great weight.'" Abbott v. Abbott, 130 S. Ct. 1983, 1993 (2010) (quoting Sumitomo Shoji Am., Inc., 457 U.S. at 185). Further, "[i]n interpreting any treaty, '[t]he opinions of our sister signatories . . . are entitled to considerable weight.'" Id. (second alteration and omission in original) (quoting El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng, 525 U.S. 155, 176 (1999)). And, of course, we look to the views of our sister circuits. See DiFiore v. Am. Airlines, Inc., 646 F.3d 81, 87-88 (1st Cir. 2011).

## III.

On cross-appeal, Polizzi contends that the district court erred in denying her Article 13 "grave risk" defense. Under Article 13, a judicial authority "is not bound" to order return of a child where "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Convention, art. 13. At trial, Polizzi's "grave risk" argument was based entirely on claims of past abuse. Polizzi argues that the district court committed legal error by improperly requiring proof of past abuse to a reasonable degree of medical certainty. She argues also that the district court committed clear error when it found that Yaman had not abused K.Y.

A.          Reasonable Degree of Medical Certainty

Polizzi argues first that the district court improperly required proof of abuse to a reasonable degree of medical certainty. Not so. As the district court correctly observed, a party opposing return based on Article 13's "grave risk" exception bears the burden of establishing that exception by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A); Danaipour I, 286 F.3d at 13. The district court then held correctly that subsidiary facts -- here, past abuse -- must be proved by a preponderance of the evidence, see Danaipour v. McLarey, 386 F.3d 289, 296 (1st Cir. 2004) ("Danaipour II"), and that Polizzi had not shown past abuse to be more likely than not. The court concluded that Polizzi had not shown by clear and convincing evidence that return to Turkey would pose a "grave risk."

The district court did ask numerous expert witnesses whether they were able to conclude with a reasonable degree of medical certainty whether past abuse had occurred. Such questioning of expert witnesses is not uncommon, even if not required, in the context of a "grave risk" inquiry. See Danaipour II, 386 F.3d at 300 (noting that expert witness testified to a reasonable degree of medical certainty that past sexual abuse had occurred). Moreover, the district court did not purport to base its conclusion just on the absence of expert testimony rising to that level of certainty. Instead, it based this conclusion on its

judgment that, having considered all available evidence, it was "more likely than not that . . . Yaman did not at any time sexually abuse his children."

B.        <u>Evidence of Past Abuse</u>

Polizzi argues in addition that the district court committed clear error when it found that Yaman had never abused his children. More specifically, Polizzi accuses the district court of deploying an improper "divide and conquer" strategy, considering each abuse allegation in isolation rather than evaluating the evidence as a whole. <u>See</u> <u>In re Adan</u>, 437 F.3d 381, 397 n.7 (3d Cir. 2006).

The district court deployed no such strategy. As the district court observed, a number of the allegations against Yaman involved conduct not at all out of the ordinary (e.g., sleeping with his crying daughter at night, K.Y. responding yes when asked during a diaper change if her father had touched her "pee pee"). As to Polizzi's more troubling allegations (e.g., Yaman's multiple erections while holding K.Y.), the district court specifically determined that Yaman's denials were credible and that Polizzi's accusations were not. The district court observed moreover that Polizzi was under continuous pressure from her mother to leave her "abusive" husband and to return with the children to the United States. Last, the district court noted that Polizzi engaged in conduct that, although perhaps unwittingly, intimated to K.Y. that

-21-

she was being abused.  Taking all of these observations together, the district court found it more likely than not that Polizzi was "acting under a well-intentioned but misguided belief that her children had been sexually abused."

Far from "divid[ing] and conquer[ing]," the district court sensitively considered all the evidence and arrived at a comprehensive explanation it deemed more plausible than the one suggested by Polizzi.  The district court's finding that Yaman never abused his children finds ample support in the record.  As such, it is not to be disturbed by this court on clear error review.  See  In re McMullen, 386 F.3d 320, 329 (1st Cir. 2004) ("[F]indings of fact are not to be disturbed [under clear error review] if 'supportable on any reasonable view of the record' . . . ." (quoting In re Carp, 340 F.3d 15, 22 (1st Cir. 2003))).

## IV.

Yaman makes three arguments on appeal.  First, he argues that the district court erred in considering whether his children were "now settled," reasoning that the one-year period that triggers the availability of Article 12's "now settled" defense is subject to equitable tolling.  Second, he argues that the district court erred in holding that it lacked discretion to order the return of a child "now settled."  Third, he argues that the district court abused its discretion when it determined, in the

alternative, that it would not order the return of the "now settled" children even if it had discretion to do so.

A.        Equitable Tolling

Yaman argues first that the one-year period that triggers the availability of Article 12's "now settled" defense is subject to equitable tolling.[12]  That interpretation finds no support in the text of the Convention.   Nor does it gain support from any extratextual source of evidence.

1.    Text

The text of Article 12 does not address equitable tolling explicitly.   It does, however, suggest that equitable tolling does not apply.   We repeat the relevant part of Article 12:

> Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal

---

[12] Yaman also argues on appeal that Polizzi should have been "equitably estopped" from arguing that the two children were "now settled."  Yaman relies upon a remark in a United States amicus brief that an authority retains discretion to make the antecedent determination whether a 'now settled' inquiry is necessary to its determination. See Br. for United States as Amicus Curiae, Lozano v. Alvarez, No. 12-820 (U.S. May 24, 2013), 2013 WL 2280948, at *7.  That issue -- of order of decisionmaking -- is neither before us nor important to this appeal.  The amicus statement does not adopt the doctrine of equitable estoppel.  For the same reasons we reject equitable tolling, we reject the argument that the doctrine of equitable estoppel precludes as a matter of law a return order.  To the extent the argument is that the conduct of the wrongfully removing parent may be considered by the court, the court did so here.

or retention, the authority concerned shall order the return of the child forthwith.

The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the proceeding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.

Convention, art. 12. Under the terms of Article 12, return of a child wrongfully removed is thus mandatory unless 1) at least one year elapsed between "the date of the wrongful removal or retention" and the date on which proceedings commenced, and 2) the child is shown to be "now settled in its new environment." There is no dispute here that one year has elapsed.

Article 12 notably does not use a trigger such as "the date the petitioning parent discovered or could have reasonably discovered the child's location." That decision evidences on the part of the drafters of the Convention a desire to have a clear trigger point for assertion of the defense: the date of wrongful removal or the date (in retention cases) of wrongful retention. See Lozano, 697 F.3d at 51 n.8 ("It would have been a simple matter, if the state parties to the Convention wished to take account of the possibility that an abducting parent might make it difficult for the petitioning parent to discover the child's whereabouts, to run the period 'from the date that the petitioning parent learned [or, could reasonably have learned] of the child's

-24-

whereabouts.' But the drafters did not adopt such language." (alteration in original)).

From the text, we think it clear Article 12's one-year period does not operate as a statute of limitations. As the Second Circuit observed in <u>Lozano</u>:

> Unlike a statute of limitations prohibiting a parent from filing a return petition after a year has expired, the settled defense merely permits courts to consider the interests of a child who has been in a new environment for more than a year before ordering that child to be returned to her country of habitual residency.

697 F.3d at 52.

The courts which have viewed this language as a statute of limitations, as we discuss later, have been concerned that to do otherwise would be inconsistent with the Convention's emphasis on prompt return. We find no textual support for that view and think the concern may be dealt with otherwise. Even if a child is found "now settled," an authority retains discretion to weigh against that finding of settledness considerations such as concealment before deciding whether to order return. Article 12 thus does provide a mechanism to prevent misconduct from being rewarded without resort to equitable tolling. <u>See</u> <u>id.</u> ("[T]he way the provision functions renders this sort of equitable relief unnecessary.").

2.    <u>Drafting History</u>

Article 12's drafting history further supports the conclusion that the one-year period is not subject to equitable tolling.

The history shows equitable tolling was explicitly discussed as a limitation on asserting the "now settled" defense, and that it was rejected.    The earlier Preliminary Draft Convention, as set forth by the Official Reporter, provided for equitable tolling explicitly, but was not adopted.    <u>See</u> Elisa Pérez-Vera, <u>Report of the Special Commission</u>, in 3 Conférence de la Haye de Droit International Privé, Actes et Documents de la Quatorzième Session, Enlèvement D'enfants 172, 202 (1982) ("3 Actes et Documents").    As a general rule, the Preliminary Draft Convention required return if less than six months elapsed between removal and the commencement of proceedings.    <u>Preliminary Draft Convention Adopted by the Special Commission</u>, in 3 Actes et Documents 166, 168.    That general rule was subject, however, to the following qualification:

> [W]here the residence of the child was unknown, the period of six months referred to in the previous paragraphs shall run from the date of the discovery of the child, subject to the proviso that the total period shall not exceed one year from the date of the breach.

<u>Id.</u>

This two-period approach in the Preliminary Draft was ultimately rejected in favor of the single-period approach

-26-

contained in Article 12. The single-period approach had two benefits in the drafters' eyes: First, it eliminated the "considerable difficulty" of determining the date the child's location was or could have reasonably been discovered. See Official Report No. 7, in 3 Actes et Documents 290, 291 ("Official Report No. 7"). Second, it established a minimum time period before an authority could consider whether a child was "now settled." See Weiner, Uprooting Children in the Name of Equity, 33 Fordham Int'l L.J. 409, 436 (2010). "[T]he difficulties encountered in any attempt to state this test of 'integration of the child' as an objective rule resulted in a time-limit being fixed which, although perhaps arbitrary, nevertheless proved to be the 'least bad' answer to the concerns which were voiced in this regard." Elisa Pérez-Vera, Explanatory Report, in 3 Actes et Documents 426, 458 ("Explanatory Report").

### 3. U.S. Executive Branch Interpretation

The Executive Branch has interpreted the Convention as we do in at least two settings. First, in the Solicitor General's brief in Lozano, the United States reasoned that "Article 12's one-year period does not function as a statute of limitations, and it is therefore not subject to equitable tolling." Br. for United States as Amicus Curiae, Lozano v. Alvarez, No. 12-820 (U.S. May 24, 2013), 2013 WL 2280948, at *8 ("U.S. Cert. Pet. Lozano Amicus Br."). The United States observed that Article 12's text and

-27-

drafting history lend further support to that conclusion. Id. at *10-13. Finally, the United States noted that Article 12 already provides a mechanism for taking into account considerations such as concealment, namely the discretion it reserves to an authority to order the return of a child even if settledness is shown. Id. at *11-12.[13] Second, although Yaman says the Executive Branch interpretation has not been consistent, that is not so. See Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944) (observing that the "weight" of the Executive Branch's position in a particular case depends in part upon "its consistency with earlier and later pronouncements"). Even before the Lozano amicus brief, the Executive Branch had taken a consistent position.

In a 1986 Legal Analysis of the Convention for the Senate Committee on Foreign Relations, Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10,494-01 (1986) ("1986 Legal Analysis"), the Department of State adopted what is an admittedly somewhat different but not inconsistent tone, remarking that "it is highly questionable" whether a parent who conceals her child "should be permitted to benefit from such conduct absent strong countervailing considerations." Id. at 10,509. That remark, however, is easy to reconcile with the current position so

---

[13] The United States took the identical position as amicus before the Second Circuit in Lozano. Mem. Br. for United States as Amicus Curiae at 2, Lozano, 697 F.3d 41 (2d Cir. 2012) (No. 11-2224).

-28-

long as one concedes, as the United States does, that Article 12 reserves for an authority the discretion to weigh such considerations against a finding of settledness when deciding whether to order return.

More difficult to reconcile is a 2006 United States Central Authority (USCA) answer to a questionnaire circulated to signatories by the Permanent Bureau of the Hague Conference on the practical operation of the Convention. See Hague Convention on Private International Law, Collated Responses to the Questionnaire Concerning the Practical Operation of the Hague Convention of 25 October 1980 on the Civil Aspects of International Child Abduction, Prelim. Doc. No. 2 (Oct. 2006), available at http://www.hcch. net/upload/wop/abd_pd02efs2006.pdf ("2006 USCA Responses"). Given an invitation to comment "on any other matters which they may wish to raise concerning the practical operation" of the Convention, the USCA responded:

> The USCA supports the concept of equitable tolling of the one-year filing deadline in order to prevent creating an incentive for a taking parent to conceal the whereabouts of a child from the other parent in order to prevent the timely filing of a Hague petition.

Id. at 568, 577.[14]

---

[14] In response to another question asking about developments in domestic judicial interpretation of the Convention, the USCA cited several cases in which courts treated Article 12's one-year period as subject to equitable tolling. 2006 USCA Responses at 217. The USCA prefaced its response, however, by noting that none of those cases "c[ould] be said to accurately reflect the settled

In contrast to the Lozano amicus briefs, the 2006 USCA response contains no analysis of the Convention's text or drafting history. See Skidmore, 323 U.S. at 140 (observing that the "weight" of an Executive Branch position depends also on "the thoroughness evident in its consideration" and "the validity of its reasoning"). Moreover, the USCA's statement that it "supports the concept of equitable tolling" is more a statement of policy preference than of legal analysis. Yaman, 919 F. Supp. 2d at 196; see also Official Report No. 7 at 292 (noting that the United States voted against the one-year period).

4.    Sister Signatories

Courts of other signatory nations have most commonly held that equitable tolling does not apply to the one-year period that triggers the availability of the "now settled" defense. In Cannon v. Cannon, [2004] EWCA (Civ) 1330, [2005] 1 W.L.R. 32 (Eng.), the Court of Appeal for England and Wales rejected equitable tolling as "too crude." Id. ¶ 51. Courts in Canada, Hong Kong, and New Zealand have also held that the one-year period that triggers the availability of the "now settled" defense is not subject to equitable tolling. See Kubera v. Kubera, [2010] BCCA 118, ¶ 64

---

law of the land" because the United States Supreme Court had yet to address the issue. Id. at 215. As the district court in this case observed, this USCA response amounts to a summary of the case law at the time, not a statement of its own interpretation of Article 12. Yaman, 919 F. Supp. 2d at 196.

-30-

(B.C.); A.C. v. P.C., [2005] HKEC 839 (H.K.);  H.J. v. Secretary for Justice, [2006] NZFLR 1005 (N.Z.).

### 5.    Sister Circuits

In its carefully reasoned opinion in Lozano, as described, the Second Circuit held that Article 12's one-year period is not subject to equitable tolling.  697 F.3d at 50-55.  By contrast, in Furnes v. Reeves, 362 F.3d 702, 723-24 (11th Cir. 2004), the Eleventh Circuit considered the one-year period to be a statute of limitations.  In Duarte v. Bardales, 526 F.3d 563, 570 (9th Cir. 2008), the Ninth Circuit, too, considered the one-year period as a statute of limitations.  In addition, the Ninth Circuit appealed to the "overarching intention of the convention -- deterring child abduction," reasoning that permitting a parent to benefit from concealment "would not only encourage child abductions, but also encourage hiding the child from the parent seeking return."  Id.  To this argument, there are two responses.  First, as the Second Circuit observed in Lozano, Article 12 also has the apparent "purpose" of protecting a child's interest in remaining in a place she is settled, parental misconduct aside, 697 F.3d at 54; as such, appeal to "intention[s]" or "purpose[s]" is not enough to settle the question of whether equitable tolling applies, see Easterbrook, Statutes' Domains, 50 U. Chi. L. Rev. 533, 546-47 (1983) (observing that statutes pursue numerous goals simultaneously).  Second, the Ninth Circuit's reasoning does not

-31-

account for the fact that Article 12 <u>already provides</u> a mechanism for deterring misconduct in the form of the authority it reserves to a court to order the return of a child found "now settled."

We join the Second Circuit's views.

B.        <u>Authority to Order Return of a "Now Settled" Child</u>

The evidence supports the district court's conclusion that the children are "now settled," and Yaman does not seriously contest that holding on appeal.  Yaman argues that the district court erred when it concluded that it lacked authority to order the return of a child found to be "now settled."  We agree.  The district court reasoned that, even if the Convention reserves such discretion to a state court, a federal district court is prohibited from ordering the return of a "now settled" child.  This conclusion, in our view, is not supported by the Convention's text or history, and is contrary to the view of the Executive Branch and the views of the other circuits.  <u>See</u> <u>Blondin</u> v. <u>Dubois</u>, 238 F.3d 153, 164 (2d Cir. 2001) (recognizing discretionary authority to return "now settled" child); <u>see</u> <u>also</u> <u>Asvesta</u> v. <u>Petroutsas</u>, 580 F.3d 1000, 1004 (9th Cir. 2009) (recognizing discretionary authority to return child even if one of Convention's affirmative defenses is established); <u>Miller</u> v. <u>Miller</u>, 240 F.3d 392, 402 (4th Cir. 2001) (same); <u>Friedrich</u> v. <u>Friedrich</u>, 78 F.3d 1060, 1067 (6th Cir. 1996) (same); <u>Feder</u> v. <u>Evans-Feder</u>, 63 F.3d 217, 226 (3d Cir. 1995) (same).

1.      <u>Text</u>

Under Article 12, a judicial or administrative authority "shall . . . order the return of the child, <u>unless</u> it is demonstrated that the child is now settled in its new environment." Convention, art. 12 (emphasis added).  To say that an authority "shall" order return "unless" a child is "now settled" is not to say that an authority is prohibited from ordering the child returned if settledness is found.

We understand the district court to have concluded that it lacked discretion to order the return of a "now settled" child for two reasons.  Firstly, the district court reasoned that Article 12's language contrasted with the language of Articles 13 and 20. Articles 13 and 20 contain <u>express</u> reservations of discretion. Article 12 contains no such express reservation.  Reasoning that the drafters of the Convention had "demonstrated the capacity to draft expressly to permit discretion," the court inferred from Article 12's lack of such an express reservation that no reservation of discretion was intended.  Secondly, the court was concerned about the particular division of jurisdiction between state and federal authorities in the United States, unlike many foreign jurisdictions.  Given the much greater role of the state

-33-

courts in child custody and welfare matters, it felt this result much better fit the limits on federal jurisdiction.[15]

As we read them, Articles 13 and 20 contain express reservations of discretion to refuse to order return so as to qualify the express requirements to order return contained elsewhere in the Convention. By contrast, because the Convention contains no express requirement to refuse to order the return of a child "now settled," there is no need to expressly reserve discretion so as to qualify any such requirement.

As the Second Circuit concluded in Blondin, Article 12 "allows -- but does not, of course, require -- a judicial or administrative authority to refuse to order the repatriation of a child" just on the basis of settledness. 238 F.3d at 164. In reaching that conclusion, the Second Circuit treated the language of Article 12 as plainly permissive. Id.; see also Lozano, 697 F.3d at 52 n.10 (noting that "[t]his interpretation of Article 12 is further bolstered by Article 18").

Article 13, by contrast, states that notwithstanding the return provisions of Article 12 mandating return in certain circumstances, the court "is not bound to order the return of [a]

_____

[15] The district court also expressed concern that if it had the authority to order the return of a "now settled" child based upon concealment, that "would be in effect [to] rebalanc[e] competing public policy concerns that were already balanced by the drafters of the Convention." If indeed the language of Article 12 were not permissive but mandatory as to refusal to order return, that would be a concern.

-34-

child" if an Article 13 defense is established or if the court finds that "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views."  Convention, art. 13.

It is consistent with the Convention's overall structure that Article 12 leaves it within a court's discretion whether to order the return of a "now settled" child.  As the Second Circuit explained in Lozano, "the default presumption under the Convention is that a child shall be returned to the state from which she originally was wrongfully removed."  697 F.3d at 51 (emphasis in original).  The Convention then goes on to specify various circumstances in which it is within a court's discretion to refuse to order return.  Under Article 13, for example, a court "is not bound to order the return of the child" if there is a "grave risk" that return would expose the child to harm.  Convention, art. 13 (emphasis added).  Similarly, under that same Article, a court "may also refuse to order the return of the child" if the child objects and is of a sufficient degree of maturity.  Id. (emphasis added).  And likewise, under Article 20, return "may be refused" if return would conflict with the protection of human rights and fundamental freedoms.  Id. art. 20 (emphasis added).  In each instance, it is within a court's discretion to refuse to order return if particular circumstances are shown.  At no point, however, is a court bound to so refuse.

In interpreting Article 12 within the context of the grant of authority to federal courts in ICARA, we presume that Congress was aware of federal courts' broad equitable powers and, in the absence of any a clear statement to the contrary, that Congress intended those powers to be available in Hague Convention cases.  See Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc., 754 F.2d 404, 416 (1st Cir. 1985) (establishing a default presumption that Congress is aware of federal courts' "inherent equity powers" and does not intend to limit those powers).  To be sure, prior to enactment of the implementing statute, federal courts had no such authority under the Convention as to order international return of abducted children.  But when Congress assigned federal courts responsibility for resolving abduction cases, we assume that Congress intended them to bring their full toolkit to the assignment.  There is no language in the implementing statute suggesting otherwise.  Indeed, Congress exhibited an intention not to limit available remedies by making clear that the Convention does not supplant remedies under "other laws."  42 U.S.C. § 11603(h).

Read against this backdrop of federal courts' broad equitable powers and the other articles of the Convention, Article 12 in its own terms confers upon a federal district court the authority to order the return of a "now settled" child.  We add that the language of Article 18 of the Convention reinforces our

reading.  According to Article 18, "[t]he provisions of this Chapter <u>do not limit</u> the power of a judicial or administrative authority to order the return of the child <u>at any time</u>." Convention, art. 18 (emphasis added).

The district court reasoned that, unlike a state court, a federal court does not enjoy the "power" to which Article 18 refers.  The district court's distinction is not based in the Convention's text, which throughout refers generically to "authorit[ies]."  It also has no basis in the text of ICARA, which states that "[t]he courts of the States and the United States district courts shall have concurrent original jurisdiction of actions arising under the Convention."  42 U.S.C. § 11603(a).  The district court relied primarily on the drafting history of Article 18.

We have considered whether principles of federalism or comparative competence would have led Congress to make state law the sole avenue for the return of settled children.  Under the district court's view of the matter, a parent seeking the return of a settled child must go to state court (or convince a federal court to exercise pendent jurisdiction) in order to enforce a return based on a foreign custody determination.  This would be consistent with the "the virtually exclusive primacy . . . of the States in the regulation of domestic relations."  <u>United States</u> v. <u>Windsor</u>, 133 S. Ct. 2675, 2691 (2013) (alteration in original) (quoting

Ankenbrandt v. Richards, 504 U.S. 689, 714 (1992) (Blackmun, J., concurring in the judgment)). As the Supreme Court has recognized, "the Federal Government, through our history, has deferred to state-law policy decisions with respect to domestic relations." Id.

Nevertheless, we are doubtful that Congress intended for this traditional separation of authority to apply in cases of international child abduction, which are matters not just of family law but also of international relations. To the contrary, Congress decided to bring federal courts into the arena by granting them concurrent jurisdiction over Hague Convention actions. 42 U.S.C. § 11603(a). In addition, 42 U.S.C. § 11604 authorizes federal courts to order "provisional remedies" in Hague Convention cases. And the implementing statute goes further, authorizing the federal government to issue regulations to carry out the Convention and requiring the State Department to coordinate on child abduction cases. 42 U.S.C. §§ 11606(c), 11608a. This is not surprising because the federal government is the usual venue for decisions bearing on foreign relations. Cf. Nat'l Foreign Trade Council v. Natsios, 181 F.3d 38, 49 (1st Cir. 1999), aff'd sub nom. Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363 (2000) ("The Constitution's foreign affairs provisions have been long understood

to stand for the principle that power over foreign affairs is vested exclusively in the federal government.").[16]

Polizzi raises an argument quite similar to the district court's, claiming that the Article 18 merely serves to clarify that the Convention does not limit whatever power to return an authority might have under other laws. Even if this reading of Article 18 were correct -- a point we need not decide -- the other powers not limited by Article 18 include the power to order the return of a settled child. We find that power reasonably implicit in both Article 12 and Congress' grant to federal courts of jurisdiction over Hague Convention actions, which we presume was enacted with awareness of the broad equitable powers that those courts customarily enjoy.

A federal court has the more limited authority to order the return of a child who was "wrongfully removed or retained" despite her being "now settled."

---

[16] We also recognize that any incursion into the traditional state-law realm of domestic relations is minimal at most. No action taken under the Convention is to be considered a determination of the merits of a child custody issue. Convention, art. 19; see also 42 U.S.C. § 11601(b)(4). Our determination that return is not required under the Convention does not in any way call into question the Turkish family court's custody decree. Neither does it alter the need for parties to seek a remedy in state law should they wish to reopen or commence new custody proceedings. Federal courts' powers under the Convention extend only so far as is necessary to enforce a preexisting custody decree where such enforcement is effectuated by the return of a wrongfully removed child. See Convention, art. 3(a) (making clear that "wrongfulness" is predicated on a "breach of rights of custody . . . under the law").

2.    U.S. Executive Branch Interpretation

The Executive Branch has consistently interpreted Article 12 as conferring upon an authority the discretion to order the return of a child found "now settled."  In the Solicitor General's brief in Lozano, the United States asserts, "a district court has equitable discretion to order a child returned even if she has become settled in her new environment."  U.S. Cert. Pet. Lozano Amicus Br. at *6.  Identifying the source of that authority, the United States explains, "the Convention expressly provides a mechanism other than equitable tolling to avoid rewarding a parent's misconduct -- discretion to order the return of a child, even when a defense is satisfied."  Id. at *11 (internal quotation marks and alteration omitted) (emphasis added).  More specifically, "a court retains equitable discretion under Article 12 to order that a child who is now settled in the United States should nonetheless be returned . . . ."  Id. at *7 (emphasis added).

In these arguments to the Supreme Court, the United States articulates the same position it did as amicus before the Second Circuit in Lozano, where it concluded that "[a] court retains equitable discretion to order a child's return at any time[,] . . . even if the child is 'now settled.'"  Mem. Br. for United States as Amicus Curiae at 2, Lozano, 697 F.3d 41 (2d Cir. 2012); see also id. at 7 ("Article 12 contemplates that a finding of settlement could be outweighed by other equitable factors

-40-

. . . ."). Explaining the nature of a court's residual discretion under Article 12, the United States explained, "[b]y using the phrase 'equitable discretion,' we mean to invoke broadly a court's inherent equitable authority." Id. at 2 n.2 (emphasis added).

This interpretation is consistent with the view expressed by the State Department in its 1986 analysis of the Convention, where it remarked:

> If the alleged wrongdoer concealed the child's whereabouts from the custodian necessitating a long search for the child and thereby delayed the commencement of a return proceeding by the applicant, it is highly questionable whether the respondent should be permitted to benefit from such conduct absent strong countervailing considerations.

1986 Legal Analysis, 51 Fed. Reg. at 10,509; see also id. ("Under Article 12, the court is not obligated to return a child when return proceedings pursuant to the Convention are commenced a year or more after the alleged removal or retention and it is demonstrated that the child is settled in its new environment." (emphasis added)).

In the Solicitor General's brief, the United States characterized Article 18 as "underscor[ing]" the "authority" conferred upon a court by Article 12 to order the return of a child "now settled." "U.S. Cert. Pet. Lozano Amicus Br. at *12. In 1986, the State Department remarked tentatively that "Article 18 provides that the Convention does not limit the power of a judicial authority to order return of a child at any time, presumably under

-41-

other laws, procedures or comity, irrespective of the child's age."

See 1986 Legal Analysis, 51 Fed. Reg. at 10,504 (emphasis added).

That is, however, not the present understanding of the Executive

Branch.

It is clear that the Executive Branch has consistently

interpreted Article 12 as conferring upon a court the authority to

order, at its discretion, the return of a wrongfully removed child

who is "now settled."

> The Executive is well informed concerning the
> diplomatic consequences resulting from this
> Court's interpretation of [the Convention],
> including the likely reaction of other
> contracting states and the impact on the State
> Department's ability to reclaim children
> abducted from this country

Abbott, 130 S. Ct. at 1993. For these reasons, we afford "great

weight" to the Executive Branch's position. Id. (quoting Sumitomo

Shoji Am., Inc., 457 U.S. at 185) (internal quotation marks

omitted).

3.    Sister Signatories

Courts of other signatory nations have held that the

Convention confers upon a court the authority to weigh

considerations such as concealment when determining whether to

order the return of a child "now settled." In Cannon, the Court of

Appeals for England and Wales remarked that "even if settlement is

established," the court could still "order a return under the

Convention." [2004] EWCA (Civ) 1330 (Eng.) ¶ 62. Similarly, in In

-42-

re M, [2007] UKHL 55, [2008] 1 A.C. 1288 (appeal taken from Eng.), the British House of Lords reached the conclusion that "article 12 does envisage that a settled child might nevertheless be returned within the Convention procedures." Id. ¶ 31. The Supreme Court of Ireland has arrived at a similar conclusion. See P. v. B., [1999] 4 IR 185; [1999] 2 ILRM 401 (Ir.) (inferring existence of discretion to order return of "now settled" child from Article 18).

### 4. Sister Circuits

Other circuits agree that the Convention confers upon a federal district court the authority to order return even if a parent establishes a "now settled" defense. While no other circuit has addressed the "now settled" defense in particular, numerous circuits accept the general proposition that "courts retain the discretion to order return even if one of the [Convention's] exceptions is proven." Feder, 63 F.3d at 226; Miller, 240 F.3d at 402 (quoting Feder); accord Friedrich, 78 F.3d at 1067 ("[A] federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention."); Asvesta, 580 F.3d at 1004 (quoting Friedrich).

We hold that the district court erred in finding it had no authority to order the return of a child found to be "now settled." We recognize that, taken in isolation, the text of Article 12 can be read differently by different viewers. Coupled,

however, with the rest of the text of the Convention, the Convention's purposes, the inherent equitable powers of federal courts, and the insights of the Executive Branch, we conclude that the Convention confers upon a federal district court the authority to order, at its discretion, the return of a child found to be "now settled."

C.      District Court's Alternate Holding: Declining to Order Return Under Equitable Powers

In a fallback and serious argument, Yaman says that even if the court retained authority to order return, the court's alternative ruling is unsustainable, and the matter must be remanded. Yaman argues that the court took its conclusion that children were "now settled" as the beginning and the end of its discretionary analysis of the return issue. Yaman argues the court in essence adopted a presumption that disfavored return if the children were "now settled."[17]

---

[17] Yaman seizes upon the following portion of the district court's reasoning as evidence of circularity:

> I don't think this is one of those egregious cases where the actual act of concealment in effect undermines settledness, and in that case I would have simply found no settledness because . . . the egregious conduct of concealment prevented the children from really developing a settled environment.

The district court's understanding of its discretion, however, is not so restrictive as Yaman suggests. In the sentences that immediately precede the above quoted passage, the district court articulated its characterization of its position:

> I would not exercise . . . discretion to order the return of the children, because on balance I feel that while I'm troubled by the concealment that

There is very little law providing guidance as to how a district court is to weight the different factors as to return at this stage. The position of the United States is that this is a matter of equitable discretion:

> In conducting that equitable assessment, the court could ultimately conclude that the abducting parent's conduct in concealing the child's whereabouts (and any other equitable factors) justify returning the child to the country of her habitual residence. Deterring concealment and ensuring that abduction does not confer tactical advantages on the abducting parent are important animating principles of the Convention. The court may therefore consider the abducting parent's misconduct, together with any other relevant circumstances, such as whether return would not be harmful or disruptive even though the child has become settled, in deciding whether to order her return.
>
> In addition, given that Article 12 contemplates that the child's settlement could be outweighed by other equitable factors, it follows that Article 12 also affords the court discretion to dispense with the "settled" inquiry -- which can involve a fact-intensive inquiry into the child's living situation -- when the court concludes that the circumstances justify ordering return regardless of the outcome of the settlement inquiry. For instance, the conduct of the concealing parent might be so extreme that return is called for irrespective of other

occurred here and troubled by [Polizzi's] actions, I believe on balance that discretion should be exercised in favor of settledness, and I believe frankly that's what the Hague Convention contemplated in the ordinary case. Further, the district court observed that to the extent to which this case was out of the ordinary, it was so in a way that disfavored return. The district court noted that, at the children's current ages, settlement was particularly important.

-45-

circumstances. That authority is underscored by Article 18, which provides that "[t]he provisions of this Chapter [enumerating exceptions] do not limit the power of a judicial or administrative authority to order the return of the child at any time."

U.S. Cert. Pet. Lozano Amicus Br., at *11-12 (alteration in original) (emphasis omitted) (citations omitted). The position of the United States refers to the equitable balancing of interests served by the Convention as opposed to an independent inquiry into the best interests of the child. Accord Cannon, [2004] EWCA (Civ.) 1330 (Eng.) ¶ 38 ("[T]he exercise of a discretion under the Convention requires the court to have due regard to the overriding objections of the Convention whilst acknowledging the importance of the child's welfare . . . ."). "The Convention is based on the principle that the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence." Abbott, 130 S. Ct. at 1995. The Convention also has as its "purpose . . . deterring child abductions," thereby "prevent[ing] harms resulting" therefrom. Id. at 1996. At the same time, Article 12 has as an additional "purpose": the protection of a child's "interest in remaining in a country in which she has lived for a substantial amount of time." Lozano, 697 F.3d at 54.

We believe Yaman has not fairly read the court's decision in wrestling with this difficult case. While a fuller explanation might have been helpful, it is well settled that the absence of a

more detailed explanation does not amount to an abuse of discretion. See United States v. Currier, 821 F.2d 52, 54 n.3 (1st Cir. 1987) (observing that a district court's "failure to elaborate on the reason" for reaching a particular determination need not imply that the court abused its discretion by "ignoring the proper factors" under the applicable balancing test (quoting Dente v. Riddell, Inc., 664 F.2d 1, 4 (1st Cir. 1981))). This is especially so where, as here, it is clear that the district looked at a great number of factors and gave meticulous attention to the concerns raised by the case. See United States v. De La Cruz, 902 F.2d 121, 123 n.1 (1st Cir. 1990) (determining that "[d]espite the lack of express findings, . . . the record reflects the district court's awareness of its responsibility to weigh the relevant factors and perform [the applicable] balancing test"). Yaman asks this court to remand to the district court with instructions to take into account a variety of interests (e.g., the interest in affording the parent a remedy for the abduction, the interest in deterring child abductions, etc.).[18] The court considered explicitly each of those interests articulated by Yaman before arriving at the conclusion that it did. In the end, Yaman's argument amounts to the claim that the district court ought to have assigned greater weight to

_____

[18] At oral argument, Yaman also complained that the district court failed to investigate whether the two children would become well settled in Turkey if removed. But we see no evidence from Yaman directly on this point and the district court carefully examined the evidence before it.

the interests that spoke in favor of return.  Such relative weighting of interests by the district court, however, is not for this court to second-guess, and especially not on an abuse of discretion analysis.

V.

We stress that this case does not involve a determination of custody.  Nothing in the case challenges the Turkish Court's award of custody to Yaman.[19]  Indeed, under Article 19, "[a] decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue."  Convention, art. 19.

We affirm the decision of the district court not to order return.

No costs are awarded.

So ordered.

---

[19] There is a separate proceeding by Yaman in the state court of New Hampshire seeking to enforce the Turkish court's award of custody.