# United States Court of Appeals
## For the First Circuit

No. 23-1548

HEITOR FERREIRA DA COSTA,

Petitioner, Appellant,

v.

JESSICA CAMILA ALBEFARO DE LIMA,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Allison D. Burroughs, U.S. District Judge]

Before

Barron, Chief Judge,
Selya and Howard, Circuit Judges.

Charles R. Hunsinger, with whom Elizabeth G. Crowley, Emily A. Weber, and Burns & Levinson LLP were on brief, for appellant.
Ruben J. Rodrigues, with whom Beth I.Z. Boland, John W. Custer, John F. Nagle, and Foley & Lardner LLP were on brief, for appellee.

February 28, 2024

**SELYA**, **Circuit Judge**.   Some problems are endemic in modern life, and this appeal — like so many before it — requires us to encounter the repercussions of divorce in a global society. After their marriage ended in Brazil, petitioner-appellant Heitor Ferreira da Costa (da Costa) accused respondent-appellee Jessica Camila Albefaro de Lima (de Lima) of absconding with their minor child to the United States where, unbeknownst to da Costa for about a year, the mother and child settled into a new life on Martha's Vineyard.   Although both parents are Brazilian nationals, they have turned to the American courts to determine the appropriate forum for their competing custodial claims under the international law of the Hague Convention on the Civil Aspects of International Child Abduction (the Convention).   In this phase of their battle, da Costa now complains that the district court failed to credit his allegations of a hasty flight that resulted in a turbulent landing for the child.   Concluding, as we do, that the district court's resolution of the pertinent factual and legal questions is amply supported by the record, we affirm.

## I

We briefly rehearse the relevant facts and travel of the case.

## A

Da Costa and de Lima — both of whom are Brazilian nationals — married, had a child, and subsequently made their home

in São Sebastião do Anta, Brazil.  The marriage ended in December of 2019 after a Brazilian court entered a divorce judgment, which incorporated an agreement that explained how each parent could spend time with the child.  De Lima was granted "definitive custody" of the child, while da Costa retained general visitation rights — subject to de Lima's approval — and was allotted parenting responsibilities for one weekend each month (an interval later expanded to two weekends each month).

Da Costa twice availed himself of this expanded parenting window before de Lima and the child surreptitiously decamped for São Paulo, Brazil — a journey that eventually took them to Martha's Vineyard, Massachusetts.  After first being removed by immigration officials, de Lima and the child successfully reentered the United States even though they lacked proper documentation.  The mother and child made their home in Martha's Vineyard, where they lived near several family members.  The child enrolled in elementary school, participated in extracurricular activities (like swim lessons), and attended mass and bible study at a local church.  De Lima has pending before United States Citizenship and Immigration Services an asylum application (which includes the child).

Da Costa remained in Brazil.  For some time, he believed that de Lima and the child had traveled only as far as São Paulo.  He was thus unaware — until about a year later — that his ex-wife

and their child were residing in the United States. Unable to locate his child in Brazil, he lodged a report with the Brazilian civil police in São Sebastião do Anta. When he learned the true state of affairs, he filed an application for return of the child with the Brazilian Ministry of Justice. Both of these initiatives proved fruitless, and da Costa then turned his attention to the American courts: he filed a petition under the Convention — as implemented in the United States by the International Child Abduction Remedies Act (ICARA), see 22 U.S.C. §§ 9001-11 — in the United States District Court for the District of Massachusetts. See Ferreira da Costa v. Albefaro de Lima, No. 22-10543, 2023 WL 4049378, at *1 (D. Mass. June 6, 2023).

**B**

The district court conducted a bench trial over three days, hearing testimony from the parties, family members, and teachers. See id. The court denied da Costa's petition. See id. Even assuming that da Costa had proven his prima facie case, he still would not prevail: de Lima had shown that the "now settled" defense applied.[1] See id. at *7. Finally, the court declined to

---

[1] In the court below, de Lima argued, in the alternative, that returning the child to Brazil would place the child at a grave risk of harm. See da Costa, 2023 WL 4049378, at *1. The district court saw no need to reach this affirmative defense, see id. at *9 n.8, and we, too, eschew it.

exercise its discretion to order the return of the child.  See id. at *9.

Based on the totality of the circumstances, the court determined "that the child [was] now settled in [his] new environment" of Martha's Vineyard.  Id. at *7 (second alteration in original) (citing Hague Convention, art. 12; Lozano v. Montoya Alvarez, 572 U.S. 1, 5 (2014)).  After all, the child had spent over half his life in Martha's Vineyard; his age (six years old) permitted him to form meaningful connections with his new environment; he had developed strong relationships with family in the United States; he had bonded with teachers and classmates; he was making substantial progress in learning English; and he regularly attended mass and a bible study course with other children in the community.  See id. at *8-9.

Of course, the court recognized that de Lima and the child, along with other family members, remained uncertain about their immigration status.  See id. at *9.  The court also recognized that de Lima and the child had moved several times and that the child's nascent English ability hindered communication.  See id.  Even so, the court did not think that any of these facts, individually or collectively, were weighty enough to tip the scales against de Lima.  See id.  De Lima was authorized to work, worked full time, and had applied for asylum.  See id.  The family's moves

were within Martha's Vineyard,[2] kept them close to family members, occurred before the child had commenced school, and were carried out in conjunction with family. See id. And the child could speak Portuguese to family members and some classmates, while his English skills continued to improve. See id.

The court then declined to exercise its discretion to order the child's return even though he was firmly settled because "the considerations related to [his] well-being outweigh[ed] the policy considerations related to deterring misconduct" by the removing parent. Id. Although de Lima had engaged in misconduct by concealing the child's location from da Costa, the court held that the interests of the child were paramount and "that requiring [the child] to return to Brazil would be disruptive, particularly given how much of his life he ha[d] spent in the United States, his strong family connections here, and his limited connections to his family in Brazil, other than to [da Costa]." Id.

This timely appeal followed.

## II

We turn to the legal standards that obtain under the Convention for establishing the now settled defense and the

---

[2] The child spent several days in Everett, Massachusetts in between moves, but there is no indication that the court considered his stay there a move outside of Martha's Vineyard. See id. at *4. Whatever the case, we think this detail inconsequential in the grand scheme of the analysis.

standard of appellate review that attaches to bench trials. Next, we consider the combined operation of these two sets of standards.

## A

Under the Convention, "[c]ourts look to the totality of the circumstances in determining whether a child is now settled." da Silva v. de Aredes, 953 F.3d 67, 75 (1st Cir. 2020). For this purpose, "[a] court may consider any relevant fact, including immigration status." Id. In the last analysis, though, immigration status remains just one relevant data point, and its weight will vary based on the idiosyncratic circumstances of each particular case. See id. Other relevant factors include:

> (1) the child's age; (2) the stability and duration of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child has friends and relatives in the new area; (5) the child's participation in community or extracurricular school activities, such as team sports, youth groups, or school clubs; and (6) the respondent's employment and financial stability.

In re B. Del C.S.B., 559 F.3d 999, 1009 (9th Cir. 2009); see Alcala v. Hernandez, 826 F.3d 161, 171 (4th Cir. 2016) (listing these factors along with immigration status); Hernandez v. Garcia Peña, 820 F.3d 782, 787-88 (5th Cir. 2016) (similar); Lozano v. Alvarez, 697 F.3d 41, 57 (2d Cir. 2012) (similar).

Even if the removing parent succeeds in showing that the child is now settled, the district court retains discretion to

order the return of the child.  See Yaman v. Yaman, 730 F.3d 1, 16 (1st Cir. 2013).  At this point in the proceedings, "[t]here is very little law providing guidance as to how a district court is to weight the different factors as to return."  Id. at 21.  We previously have termed this decision "a matter of equitable discretion."  Id.  Given the elasticity of that term, a court may "consider the abducting parent's misconduct, together with any other relevant circumstances, such as whether return would not be harmful or disruptive even though the child has become settled, in deciding whether to order [his] return."  Id.

**B**

Following a bench trial, we review the district court's legal conclusions de novo.  See ST Eng'g Marine, Ltd. v. Thompson, MacColl & Bass, LLC, 88 F.4th 27, 32 (1st Cir. 2023).  "This review encompasses 'determinations about the sufficiency of the evidence.'"  Id. (quoting Aadland v. Boat Santa Rita II, Inc., 42 F.4th 34, 41 (1st Cir. 2022)).  Conversely, we review decisions left to the district court's sound judgment for abuse of discretion.  See Yaman, 730 F.3d at 10.  As an English court aptly phrased it, "the exercise of a discretion under the Convention requires the court to have due regard to the overriding objectives of the Convention whilst acknowledging the importance of the child's welfare."  Cannon v. Cannon, [2004] EWCA (Civ) 1330, [2005] 1 W.L.R. 32 (Eng.) ¶ 38.

- 8 -

"Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous." Fed. R. Civ. P. 52(a)(6); see Aadland, 42 F.4th at 41. The appellate "court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P. 52(a)(6). "The clear error standard is deferential and, where it applies, we will not overturn a factual finding unless — on the whole of the record — we are 'left with the definite and firm conviction that a mistake has been committed.'" ST Eng'g Marine, 88 F.4th at 32 (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)). "[T]he appropriate standard of appellate review for a mixed question [of law and fact] 'depends . . . on whether answering it entails primarily legal or factual work.'" Monasky v. Taglieri, 140 S. Ct. 719, 730 (2020) (third alteration in original) (quoting U.S. Bank N.A. v. Vill. at Lakeridge, LLC, 583 U.S. 387, 396 (2018)).

## C

In Convention cases, the "'now settled' defense[] require[s] the court to identify a broad standard and then answer the factual question[] of . . . whether the abducted child is 'now settled.'" da Silva, 953 F.3d at 72. As the Supreme Court has explained in the analogous context of determining a child's country of habitual residence, "[t]he inquiry begins with a legal question: What is the appropriate standard" to ascertain whether a child is

- 9 -

now settled? Monasky, 140 S. Ct. at 730; see da Silva, 953 F.3d at 72 (applying reasoning in Monasky to now settled defense in Convention case). The standard for the now settled defense mirrors that of the country-of-habitual-residence determination — that is, a totality-of-the-circumstances approach. See da Silva, 953 F.3d at 72.

"Once the [district] court correctly identifies the governing totality-of-the-circumstances standard, . . . what remains for the court to do in applying that standard . . . is to answer a factual question: [Has] the child" become settled in his new environment? Monasky, 140 S. Ct. at 730; see da Silva, 953 F.3d at 72. Thus, our review of that question is for clear error. See da Silva, 953 F.3d at 72.

## III

Da Costa identifies several reasons why the district court committed clear error by finding that the child had become settled. First, he contends that the court clearly erred because it relied entirely on evidence of events that occurred after he filed the petition. Second, he contends that the court clearly erred because it did not appropriately weigh the relevant factors (given that the now settled defense must be interpreted narrowly). Third, he contends that the court clearly erred because it inappropriately considered the child's best interests. None of these entreaties carries the day.

**A**

At the outset, da Costa asserts that relying solely on evidence that postdates the petition's filing — as the district court purportedly did here — does not align with the reasoning behind the now settled defense. The now settled defense's requirement that one year must pass after the petition's filing, he maintains, "is a recognition that one year gives a child the opportunity to form ties to a new community and is intended to ensure rapid attempts to recover a wrongfully removed child."[3] De Lima rejoins that this argument is waived and that, in all events, it defies the text of the Convention. We start with the waiver question before turning to the textual question. Because the parties' arguments are of a legal nature, our review is de novo. See ST Eng'g Marine, 88 F.4th at 32.

**1**

De Lima exhorts us to find that da Costa waived this argument by failing to object to her introduction of post-petition

---

[3] As a threshold condition, the Convention requires that one year must have passed between the date of wrongful removal and the commencement of proceedings to seek return of the child before the removing parent can invoke the now settled defense. See Hague Convention, art. 12. The district court determined that — under ICARA — "only the filing of a civil action in a court where the child is located is sufficient to commence . . . proceedings" and that da Costa had filed his petition one year after any of the possible dates of wrongful removal for which the parties argued below. da Costa, 2023 WL 4049378, at *7-8. This determination is not disputed on appeal.

evidence and remaining silent on the matter throughout briefing and closing argument. See Allied Int'l, Inc. v. Int'l Longshoremen's Ass'n, 814 F.2d 32, 39 (1st Cir. 1987) ("It is axiomatic that the failure to object at trial, absent exceptional circumstances . . ., forecloses any opportunity to challenge the admissibility of the evidence on appeal."). Thus, de Lima insists, da Costa waived any challenge to the court's consideration of post-petition evidence.

This objection misconstrues da Costa's position. He does not urge a categorical exclusion of post-petition evidence. Instead, he deems it clearly erroneous to rely only on post-petition evidence or, at least, to weigh the post-petition evidence as heavily as did the court below. Even though de Lima's alleged paucity of pre-petition evidence certainly could have been fodder for da Costa's closing argument, it was not until the court rendered its decision that the alleged error was committed, affording da Costa something concrete to challenge. We, therefore, reject the suggestion of waiver and proceed to the meat of da Costa's objection.

**2**

With respect to the merits, da Costa offers no case law in support of his theory. What is more, the Convention itself gives a strong indication that post-petition evidence remains important. In describing the now settled defense, the Convention's

text reads in relevant part: "The judicial or administrative authority, <u>even where the proceedings have been commenced after the expiration of the period of one year</u> [following the child's wrongful removal], shall also order the return of the child, unless . . . the child is <u>now settled</u> in [his] new environment." Hague Convention, art. 12 (emphases supplied).

Refined to bare essence, the text of the Convention explicitly contemplates a court considering the child's circumstances after the petition has been filed without reference to his prior situation. The phrase "now settled" — the wording of which itself suggests an emphasis on the present — is introduced in the context of post-petition circumstances without reference to pre-petition circumstances. If the drafters of the Convention had intended to require that the removing parent include pre-petition evidence, one would expect them to have expressed that intent more explicitly in the text.

Yet, da Costa has presented no probative evidence of such an intent. Rather, he tells a different tale — a tale of how "becoming settled in a new environment is a process that extends from the time the child enters the new environment through the present." Without pre-petition evidence, he continues, "there can be no analysis of when the child became well-settled, how the child adjusted between the date of removal and the date of filing of the

petition, and the steps [the removing parent] took to ensure that a child was well-settled."

Although we see a glimmer of truth in these statements, they do not resolve the issue before us. Showing that a child is settled does not necessarily require showing the adjustment process through which the child became settled — though adducing such evidence sometimes may be helpful. Da Costa may be right in suggesting that this "evidence would have been not only more credible but also more powerful," but that insight does little to advance his cause. Evaluating the strength of post-petition evidence — and whether it proves sufficient in the absence of pre-petition evidence — turns on assessing credibility and weighing facts. These tasks are grist for the district court's mill, and the results are not for us to reevaluate unless they can be shown to be clearly erroneous.

Nevertheless, the district court did describe earlier chapters of the child's journey, which began years before the petition was filed. See da Costa, 2023 WL 4049378, at *4. It recalled that the child had lived on Martha's Vineyard since December of 2019 and, at times, shared a home with his grandparents and half-brother. See id. To the extent that da Costa thinks this part of the story incomplete, we reiterate that we are in no position to rewrite such fact-intensive judgments without a showing of clear error.

Da Costa tries to buttress this argument in yet another way:  he strives to persuade us that rejecting his position would allow a removing parent to manufacture evidence in response to a petition, which would thwart the Convention's underlying goals and strong presumption in favor of returning a child to the country of habitual residence.  We are unconvinced.

Whether the removing parent constructed a facade that the child is settled reduces to a question of credibility.  If the removing parent took actions designed to secure a stronger litigation position rather than to settle the child, a reviewing court may discredit that evidence.  On the other hand, if those actions nonetheless contributed to the child's being settled, we see no reason to exclude them entirely.  And if the removing parent attempted such bad-faith gamesmanship, the court retains equitable discretion to order the child's return whether or not it finds him to be settled.  See Yaman, 730 F.3d at 19.

**B**

Da Costa has a fallback position:  he posits that the district court "erred in weighing the applicable considerations and facts" under the now settled analysis by using the wrong geographic scope in defining the child's "new environment," mischaracterizing the stability of the child's living situation, and ignoring de Lima's misconduct in removing the child from Brazil.  De Lima responds that this "kitchen-sink approach"

attempts to jumble together "a variety of disparate arguments, none of which demonstrate[s] clear error." We agree. Separating da Costa's fusillade into its component parts, we find no basis to second-guess the district court's judgment.

Because these arguments effectively challenge the court's finding that the child was settled, our review is for clear error. See da Silva, 953 F.3d at 72. Da Costa first complains that the court employed the wrong definition of "new environment" by considering only Martha's Vineyard, instead of the entire United States. The record, however, flatly contradicts da Costa's plaint: the district court explicitly found "that [the child] is settled in the United States." da Costa, 2023 WL 4049378, at *9.

We note, moreover, that da Costa's complaint is puzzling. In a country as expansive as ours, one need not have connections to wide swaths of its lands in order to be settled therein. By being settled in one region of a country — here, Martha's Vineyard — one is by definition settled in that country. Many natural-born citizens of the United States have yet to venture beyond their home states, but it would be chimerical to suggest that these persons are not settled in their native land.

Proceeding past the question of regionalization, da Costa reprises his own narrative questioning the district court's findings. The key facts include that the child's living situation is less than stable due to his repeated moves (one of

which was outside of Martha's Vineyard); that the immigration statuses of the affected parties remain uncertain; that the child is too young to have his opinion considered, especially given that younger children are less likely to form attachments to their environment; and that the child had only minimal adjustment to his environment, particularly at school, in part because of the language barrier.

These facts, cherry-picked from the record, do not move the needle. The district court considered every fact that da Costa now brings to our attention but found each of them outweighed by other evidence. See da Costa, 2023 WL 4049378, at *9. Specifically, the court noted that de Lima was authorized to work, worked full time, and had applied for asylum; that the family's moves (mostly) remained within Martha's Vineyard, were with or near other family members, and occurred before the child had started school; that the child still could speak Portuguese to family members and some classmates, while his English skills improved rapidly; and that the child appeared to be connecting with teachers and classmates inside and outside of the classroom. See id.

Nowhere does da Costa identify a factual finding that is unsupported by the record. Nor does he highlight an instance in which the court improperly credited or discredited evidence in evaluating the totality of the circumstances. And we have no

- 17 -

warrant to displace fact-based conclusions at which the court reasonably arrived. See Foster v. Dalton, 71 F.3d 52, 55 (1st Cir. 1995) ("Following a bench trial, an appellate tribunal is not warranted in substituting its judgment for that of the trial court."). What remains is that the district court did not weigh the evidence as da Costa would have preferred — but that hardly amounts to clear error.

Da Costa has yet another shot in his sling. He suggests that the district court ignored de Lima's misconduct in secretly fleeing with the child to the United States. But this suggestion is of little consequence: we fail to see how concealing the child's location or allegedly forging a signature on the child's passport has anything to do with whether the child is settled in a new environment.

To be sure, the Supreme Court has acknowledged that "steps taken to promote concealment can also prevent the stable attachments that make a child 'settled.'" Lozano, 572 U.S. at 17. But the cases to which the Court cites connect the misconduct to the child's being settled. See, e.g., Mendez Lynch v. Mendez Lynch, 220 F. Supp. 2d 1347, 1363 (M.D. Fla. 2002) (finding children not settled when mother "took active and consistent steps to prevent contact between the children and their father"); Wigley v. Hares, 82 So.3d 932, 942 (Fla. Dist. Ct. App. 2011) ("The mother purposely kept [the child] out of all community activities, sports,

and even church to avoid detection by the father."). Here, however, the steps allegedly taken to conceal the child have no bearing on whether he was settled.

## C

Da Costa's final claim is that the district court's analysis was "tainted" by inappropriate consideration of the child's best interests — a concern not contemplated by the Convention.[4] See Whallon v. Lynn, 230 F.3d 450, 460 (1st Cir. 2000) (explaining that it is inappropriate to "risk substituting a best interest of the child analysis for the analysis the Convention requires"). This claim is wide of the mark.

To a large extent, "[t]he Convention is based on the principle that the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence." Abbott v. Abbott, 560 U.S. 1, 20 (2010). Even so, "[t]he Convention also has as its 'purpose . . . deterring child abductions,' thereby 'prevent[ing] harms resulting' therefrom." Yaman, 730 F.3d at 22 (second and

---

[4] Da Costa also criticizes the court's concluding commentary "that [the child] appears to be a happy and well-adjusted child who is lucky enough to have two parents who love him and want him to be with them" and that the court hopes "[de Lima] and [da Costa], as parents and not litigants, can find a way to do what is best for [the child]." Da Costa may think that such commentary has no place in a judicial decision, but regardless of whether this belief is merited, what is conspicuously clear is that the court's closing remarks played no role in its legal analysis.

third alterations in original) (quoting Abbott, 560 U.S. at 20-21). In other words, once beyond the prima facie case, the Convention adopts "an additional 'purpose': the protection of a child's 'interest in remaining in a country in which [he] has lived for a substantial amount of time.'" Id. (quoting Lozano, 697 F.3d at 54).

Recognizing this other purpose of the Convention, the district court had the discretion to consider — in its analysis of whether equitable factors supported the child's return to Brazil even though he had become settled — the effect that the return would have on the child's wellbeing. See da Costa, 2023 WL 4049378, at *9. What is more, da Costa does not point to anything in any other portion of the court's opinion tending to indicate an improper consideration of the child's best interests. And contrary to da Costa's earlier importunings, de Lima's misconduct was considered and weighed against the child's interests. See id. The court found that the child appeared to be doing well in the United States, while the extent of de Lima's misconduct remained disputed (particularly the veracity of the allegation that she forged da Costa's signature on the child's passport). See id.

Thus, it concluded that returning the child to Brazil — where he has limited connections other than to da Costa — would be disruptive because he has spent most of his life in the United States and has developed many meaningful connections here. See

id. Put another way, equity could not be served by ordering the child's departure from a supportive environment and the return to a less supportive one simply as punishment for the removing parent's alleged malfeasance.

To say more would be to paint the lily. We can discern no clear error based on these factual findings. The court recognized that de Lima admitted to hiding the child's location, and with respect to the child's passport, all that the record reflects is conflicting testimony about whether da Costa signed it. See id. Nor can we detect an abuse of discretion in connection with the court's decision. Da Costa primarily takes issue with the court lending credence to the child's interests in remaining on Martha's Vineyard while discounting his interests in returning to Brazil, but "[s]uch relative weighting of interests by the district court . . . is not for this court to second-guess, and especially not on an abuse of discretion analysis." Yaman, 730 F.3d at 22.

## IV

We need go no further. For the reasons elucidated above, the judgment of the district court is


**Affirmed**.