# United States Court of Appeals
## For the First Circuit

No. 25-1360

EDERVALDO RODRIGUES DA SILVA,

Petitioner, Appellee,

v.

JESSICA SILVEIRA DA SILVA,

Respondent, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Allison D. Burroughs, U.S. District Judge]

Before

Barron, Chief Judge,
Gelpí and Aframe, Circuit Judges.

Lea Gulotta James, with whom Beth I.Z. Boland, Amani Kmeid, Ruben J. Rodrigues, and Foley & Lardner LLP were on brief, for appellant.

Charles R. Hunsinger, with whom Elizabeth G. Crowley and Bowditch & Dewey LLP were on brief, for appellee.

June 30, 2025

**GELPÍ, Circuit Judge.** Approximately two years after Respondent-Appellant Jessica Silveira da Silva ("Silveira") brought her minor son ("A.R.") to the United States, A.R.'s father, Petitioner-Appellee Edervaldo Rodrigues da Silva ("Rodrigues"), initiated proceedings in federal court to return A.R. to Brazil under the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention"). After Rodrigues proved that A.R. had been wrongfully removed, Silveira invoked the "now settled" defense under the Hague Convention, asserting that A.R.'s extensive ties to the community in Lowell, Massachusetts, weighed against returning him to Brazil. The district court disagreed.

On appeal, Silveira argues that the district court committed both legal and factual errors, which mandate reversal. The district court engaged in a thorough analysis and "grapple[d] with difficult factual circumstances in which no outcome may [have] appear[ed] ideal." Mendez v. May, 778 F.3d 337, 347 (1st Cir. 2015). Ultimately, we hold that it erred in concluding that A.R. is not settled in the United States. Accordingly, we **vacate** and **remand**.

## I. THE HAGUE CONVENTION

The Hague Convention generally "aims to deter parents from abducting their children to a country whose courts might side

with them in a custody battle."[1]  Díaz-Alarcón v. Flández-Marcel, 944 F.3d 303, 305 (1st Cir. 2019).  As implemented in the United States by the International Child Abduction Remedies Act ("ICARA"), see 22 U.S.C. §§ 9001-11, the Hague Convention allows a parent to, among other things, "petition a federal or state court to return an abducted child to the child's country of habitual residence," Díaz-Alarcón, 944 F.3d at 305; see also 22 U.S.C. § 9003(b).  But that petition does not grant a court carte blanche to preside over a custody battle.  Rather, it permits the court to determine "whether a custody decision should be made in the United States or in the country of the child's habitual residence." Avendano v. Balza, 985 F.3d 8, 11 (1st Cir. 2021).

To prevail on the petition, "the party seeking relief must establish by a preponderance of the evidence that the abductor 'wrongfully removed or retained [the child] within the meaning of the [Hague] Convention.'"  Díaz-Alarcón, 944 F.3d at 305 (first alteration in original) (quoting 22 U.S.C. § 9003(e)(1)).  If the petitioner does so, the Hague Convention's "strong presumption in favor of returning [the] wrongfully removed or retained child" applies.  Id. (quoting Darín v. Olivero-Huffman, 746 F.3d 1, 8

---

[1] The Hague Convention counts among its signatories over one hundred countries, including the United States and Brazil.  See HCCH, 28: Convention of 25 October 1980 on the Civil Aspects of International Child Abduction (last updated Nov. 14, 2022), https://www.hcch.net/en/instruments/conventions/status-table/?cid=24 [https://perma.cc/HJ29-6Y68].

(1st Cir. 2014)). That presumption, however, is not insurmountable: the respondent may overcome it by proving one of the Hague Convention's few, narrowly construed affirmative defenses. See Avendano, 985 F.3d at 11; see also da Silva v. de Aredes, 953 F.3d 67, 72-73 (1st Cir. 2020) ("The affirmative defenses to this presumption are construed narrowly.").

Relevant to this appeal is the "now settled" defense. See da Costa v. de Lima, 94 F.4th 174, 179 (1st Cir. 2024). If invoked, the defense allows a district court to decline to order the return of a child if the respondent proves by a preponderance of the evidence that (a) "the petition for return has been filed one year or more after the wrongful removal" and (b) "the child is now settled in the new country." da Silva, 953 F.3d at 75. That is not all. Even if the respondent clears that hurdle, the district court still "retains discretion to order the return of the child." da Costa, 94 F.4th at 180. There exists "very little law providing guidance" to district courts on how to exercise that "equitable discretion" at that final stage. Id. (quoting Yaman v. Yaman, 730 F.3d 1, 21 (1st Cir. 2013)). And so, we have said, a district court can "consider the abducting parent's misconduct, together with any other relevant circumstances, such as whether return would not be harmful or disruptive even though the child has become settled, in deciding whether to order [the child's] return." Id. (quoting Yaman, 730 F.3d at 21).

- 4 -

With that legal framework in mind, we turn to the travel of this case. On March 28, 2022, Silveira and A.R. left Brazil. By April 3, 2022, they had crossed the southern border into the United States. They then made their way to Massachusetts. Just over two years later, Rodrigues (A.R.'s biological father) initiated proceedings against Silveira and Silveira's now-husband (A.R.'s now-stepfather), Gilberto Lucas ("Lucas"),[2] seeking the child's return to Brazil under the Hague Convention and ICARA. The district court held a three-day bench trial in October 2024, during which it heard testimony from several witnesses, including Silveira. We derive the following facts from the testimonial and documentary evidence introduced at trial.

### A. Factual Background[3]

### 1. Rodrigues and Silveira's Relationship

Rodrigues and Silveira -- both citizens and natives of Brazil -- married on May 13, 2011. They settled in the city of

---

[2] The district court granted Silveira's motion to dismiss Lucas as a respondent during the bench trial.

[3] In considering whether the district court erred in finding that A.R. is not settled, "we accept the district court's findings of fact unless they are clearly erroneous, keeping in mind that the district judge had the opportunity to assess the credibility of the witnesses." Janeiro v. Urological Surgery Pro. Ass'n., 457 F.3d 130, 138 (1st Cir. 2006).

Belo Horizonte, Brazil.  About three years into their marriage, they had A.R.

The couple separated in 2016.  Although they did not legally divorce, the couple lived separate lives.[4]  Rodrigues moved to his mother's home in a nearby town.  Silveira, who remained A.R.'s primary caretaker, eventually moved in with her mother, too.  During that time, Rodrigues visited A.R. about two weekends per month.

At some point in 2021, Silveira began a romantic relationship with Lucas.  Shortly after their relationship started, Lucas immigrated to the United States.  Silveira remained in Brazil, and she and Rodrigues legally divorced on December 10, 2021.  The terms of their divorce dictated that the couple would share custody of A.R., but A.R. would continue to live with Silveira.

## 2. A.R.'s Removal from Brazil

In the months following their divorce, Silveira expressed to Rodrigues her desire to travel to the United States. Rodrigues admits as much, but he disputes whether Silveira told him she intended to permanently reside with A.R. in the United

---

[4] Silveira claims that she separated from Rodrigues because of domestic issues, including domestic abuse.  Rodrigues denies the allegations of domestic abuse, instead claiming that infidelity caused their separation.

States.  So, Rodrigues signed a passport application that included a travel authorization permitting A.R. to travel outside of Brazil.

Eventually, Rodrigues grew "suspicious" that Silveira was planning to leave Brazil with A.R.  Rodrigues, in turn, sought to cancel A.R.'s passport around March 17, 2022.  But his attempt failed, and Silveira and A.R. left Brazil around March 28, 2022.  Silveira and A.R. first flew to Colombia and then Mexico, where they crossed the Mexico-United States border on April 3, 2022.  Silveira has since applied for asylum in the United States.

Meanwhile, unaware that Silveira and his son had already left Brazil, Rodrigues filed a report with the Brazilian police on March 30, 2022, expressing his fear that Silveira would unlawfully take A.R. from Brazil.  He learned from a family member in April 2022 that A.R. had left Brazil.  Rodrigues later confirmed through social media that Silveira and A.R. were living in Lowell.  For a time, A.R. and Rodrigues did not communicate regularly.  Now, they have video calls about three times a week.

### 3. Silveira's and A.R.'s Lives in Lowell

Once in the United States, Silveira and A.R. began living uninterruptedly with Lucas in Lowell.[5]  They have lived together ever since.  Silveira described A.R.'s relationship with Lucas as "good" and "healthy," and claims that they often spend time

---

[5] The family has moved residence once within Lowell.

- 7 -

together one-on-one and as a family.  Both Silveira and Lucas have steady jobs and incomes.  Silveira married Lucas on September 18, 2024.

While Silveira does not have any family in the United States, Lucas does.[6]  Silveira and A.R. consistently spend time with Lucas's family.  Indeed, during Silveira and A.R.'s first year in Lowell, they lived with Lucas, Lucas's brother, Gilmar Junior Torres dos Santos ("Torres dos Santos"), and Torres dos Santos's wife, Bruna Coutinho Suarez dos Santos ("Coutinho"). During that first year, Torres dos Santos would regularly care for A.R. after school before his mother came home from work, and the two families would spend quality time together on the weekends. Torres dos Santos and Coutinho now live nearby in Gloucester, Massachusetts, but continue to see A.R. twice a month.  A.R. also spends holidays and other special occasions with Lucas's extended family.  Torres dos Santos and Coutinho testified that they consider A.R. their nephew and would be willing to provide financial assistance to him if he needed it.

### 4. A.R.'s Schooling and Extracurricular Participation

Before moving to the United States, A.R. only received about a year of schooling, most of it at home, due to the COVID-19

---

[6] Lucas has an aunt, a brother, a brother-in-law, and several cousins in Massachusetts.  One of Lucas's cousins has a child that is around A.R.'s age, with whom A.R. plays during family gatherings.

pandemic.  As a result, A.R. did not learn to read or write in Portuguese.

Since arriving in Lowell, A.R. has attended the same elementary school.  Although A.R. has progressed to the fourth grade, his first year at school was not without its challenges.  During his first year, he experienced trouble adjusting to his new classroom environment and meeting Massachusetts curriculum standards.  In particular, record evidence indicates that A.R. often got distracted, exhibited disruptive behavior, and disturbed his classmates' learning.  He struggled academically, too, and his inability to communicate well in English hampered his learning.

But A.R. showed marked improvement in third grade, his second year of school in the United States.  Despite some attendance-related issues, his in-class conduct, academic performance, and English-language skills all improved.  In fact, A.R.'s third-grade teacher, Sarah Hoey, testified that he "ha[d] grown in many ways during the school year" and had "me[t] expectations of the classroom" by the middle of the school year.  She also said that his overall English skills improved such that he became an "interpreter" for other Brazilian peers struggling to understand English.

Outside of school, A.R. engages with other children, including at soccer practice and in church.  By the time of trial, A.R. had been on a soccer team -- practicing soccer twice a week -

- for about three months.  He also regularly attends church and, while there, participates in a youth group.  Lowell has a significant Brazilian community, and Silveira testified that A.R. has about five Brazilian friends.

### B. District Court's Decision

After the bench trial, the district court issued its findings of fact and conclusions of law.  To begin, it held that Rodrigues had met his prima facie burden to show that A.R. was wrongfully removed from Brazil.  Then, it considered -- and rejected -- the three exceptions Silveira had raised: the "consent[]" exception, the "now settled" exception, and the "grave risk" exception.  Because Silveira challenges only the district court's analysis of the "now settled" exception, we limit our discussion to that which is pertinent to resolving this appeal.

The district court started the relevant analysis by concluding that the proceeding had commenced more than a year after A.R.'s removal from Brazil.[7]  Then, after turning to the "now settled" discussion, the district court identified seven factors it would consider in deciding whether A.R. was settled: (1) A.R.'s age, (2) "the stability and duration of [A.R.'s] residence in the new environment"; (3) whether A.R. consistently attended school; (4) "whether [A.R.] ha[d] friends and relatives in the new area";

---

[7] Neither party challenges that determination on appeal.

- 10 -

(5) A.R.'s involvement in the community and in extracurricular activities, "such as team sports, youth groups, or school clubs"; (6) Silveira's "employment and financial stability"; and (7) Silveira's and A.R.'s immigration statuses. (Citation omitted.) It noted, too, that courts sometimes "consider the amount of time [the] child has spent in the country, as well as [his] academic performance, social networks and relationships, and, under some circumstances, country of citizenship." (Citation omitted.)

Having identified those factors, the district court then proceeded to apply the facts. It started with A.R.'s age. And because A.R. was nearly eight years old when he came to the United States and had lived here for more than two years, the court reasoned that the first factor "weigh[ed] in Respondent's favor."

As to the second factor -- the stability of A.R.'s residence -- the district court held that it "overall, disfavor[ed] Respondent's defense or [was], at best, neutral." The district court acknowledged that certain facts favored Silveira. For instance, it stated that A.R. had only moved homes one time during his two years in the United States. Likewise, the district court pointed out that A.R. "ha[d] consistently lived with Respondent and [Lucas], and occasionally with other extended family as well." And, the court said, A.R. had "attended the same elementary school since arriving in the United States." Those

- 11 -

were facts, the district court explained, that "play[ed] a significant role in the 'settled' inquiry." (Citation omitted.)

Despite those favorable findings, the district court observed that A.R. had not demonstrated "strong family and community ties in the United States." Specifically, the district court stated:

> On the one hand, [Coutinho] and [Torres dos Santos] credibly testified that they care deeply for A.R. and that, after living together for nearly a year, they continue to see A.R. about twice a month. A.R.'s extended family, all of whom have been introduced to him through [Lucas], also gather for holidays and other special occasions. On the other hand, the Court [could] not ignore that A.R. did not know his extended family until he traveled to the United States and that these relationships are relatively new. He might have spent the past two years with extended family here, but he has also spent the first eight years of his life with his father and other extended family in Brazil . . . . Further, although Respondent testified that A.R. has friends in his neighborhood and school, "the record lacks information regarding the number or qualities of those relationships." (Citation omitted.)

According to the district court, those "facts call[ed] into question whether A.R. [wa]s settled within the meaning of the Convention."

Continuing its review of the factors, the district court moved to the third factor -- "A.R.'s school attendance and life at [his] [e]lementary [s]chool." The district court cited conflicting evidence and testimony. It assessed some of A.R.'s

- 12 -

attendance-related issues. It explained that A.R. had "missed a non-trivial number of school days in his first two years": ten days the first year and nineteen days the second year. The court acknowledged that A.R.'s attendance "may [have been] improving" but still "weigh[ed]" the absences "negatively." Similarly, the court weighed conflicting evidence regarding A.R.'s performance and behavior in the classroom. Although it recognized the evidence of A.R.'s improving academic performance, behavior, and English-speaking skills, the court ultimately concluded that the third factor "indicate[d] that [A.R.] struggles to adapt to his new environment." The court relied on A.R.'s disruptive behavior in class, his report card that showed "perform[ance] below the curriculum standards," and Silveira's testimony that A.R. did not communicate well in English.

Turning to the fourth factor -- whether A.R. has friends and relatives in the new area -- the court found that it did not "fully support[] Respondent's contention that [A.R. was] settled." The court doubted "the strength of A.R.'s relationship with his relatives in the United States," inferred that A.R. and his stepfather were not "particularly close," and again cited its lack of knowledge about the quality of A.R.'s relationships beyond his extended family members.

The district court held that the fifth factor -- A.R.'s community involvement and extracurricular activities -- did "not

weigh in Respondent's favor" either. Despite acknowledging A.R.'s biweekly church attendance and his three months of participation on a soccer team, the court reasoned "that for the majority of his time in the United States, [A.R.] did not participate in any significant after-school activities."

The court did, however, decide that the sixth factor -- A.R.'s financial stability -- supported a finding that he is settled. It pointed to Silveira's and Lucas's steady employment and income to support that conclusion.

Finally, the court briefly considered Silveira's and A.R.'s immigration statuses. After determining that there existed "no apparent immediate threat of deportation," the district court did not weigh that factor against Respondent.

Considering the foregoing factors, the district court admitted that "[t]his was a close call and a difficult decision" but ultimately held that Silveira had not carried her burden of demonstrating that A.R. is settled. As a result, the court ordered Silveira to make arrangements to return A.R. to Brazil. Silveira filed this appeal shortly after moving to stay the order of return.[8]

### III. ARGUMENTS ON APPEAL

Silveira raises two main arguments on appeal. First, she claims that the district court misapplied the legal standard

---

[8] The district court stayed the order of return until July 1, 2025.

- 14 -

by engaging in a comparative analysis. That is, the district court allegedly compared A.R.'s life in the United States to his life in Brazil when determining if he was "now settled." Second, she argues that the district court clearly erred in its weighing of the evidence and its ultimate conclusion that A.R. was not "now settled." Because we agree with the second point, we need not address Silveira's first argument.

## IV. STANDARDS OF REVIEW

Before reaching the merits, we must determine our standard of appellate review. Following a bench trial, we review de novo a district court's legal conclusions. da Costa, 94 F.4th at 180. In Hague Convention cases, that means we view with fresh eyes the district court's interpretation of said convention. See Yaman, 730 F.3d at 10. We do the same when a district court applies "the [Hague] Convention to facts." Id. We, however, examine the trial court's findings of fact under the deferential clear error standard. See Fed. R. Civ. P. 52(a)(6). Thus we overturn factual determinations only if, "on the whole of the record[,] we are 'left with the definite and firm conviction that a mistake has been committed.'" da Costa, 94 F.4th at 181 (quoting ST Eng'g Marine, Ltd. v. Thompson, MacColl & Bass, LLC, 88 F.4th 27, 32 (1st Cir. 2023)).

As to the "now settled" determination, we have broken down our review into two distinct questions. First, a legal one:

"'What is the appropriate standard' to ascertain whether a child is now settled?" da Costa, 94 F.4th at 181 (quoting Monasky, 589 U.S. at 84). And second, "[o]nce the [district] court correctly identifies the governing totality-of-the-circumstances standard," a factual question remains: "'[Has] the child' become settled in his new environment?" Id. (second and third alterations in original) (quoting Monasky, 589 U.S. at 84). We review the former de novo and the latter for clear error. Id.

## V. DISCUSSION

We next turn to the merits. First, we begin by clarifying the proper standard through which we evaluate the evidence. Second, we hold that the evidence, viewed through a holistic lens, compels the conclusion that A.R. is "now settled" in the United States.

### A. The "Now Settled" Standard

The district court must consider the totality of the circumstances when determining whether a child is settled. da Costa, 94 F.4th at 180. In conducting that task, a district "court may consider any relevant fact," including:

> (1) the child's age; (2) the stability and duration of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child has friends and relatives in the new area; (5) the child's participation in community or extracurricular school activities, such as team sports, youth groups,

- 16 -

or school clubs; and (6) the respondent's employment and financial stability.

Id. (quoting In re B. Del C.S.B., 559 F.3d 999, 1009 (9th Cir. 2009)). Immigration status may be relevant, too. Id.

But our exposition of potentially relevant factors should not be construed as having created a rigid balancing test composed of seven binary factors. To be clear, the factors are neither mandatory nor exhaustive. See Alcala v. Hernandez, 826 F.3d 161, 171 (4th Cir. 2016) ("[S]uch factors are non-exhaustive, and in a particular case some of these considerations may not apply and additional considerations may be relevant."). After all, each case is different, and the relevance of -- and weight attributed to -- certain factors "will vary based on the idiosyncratic circumstances of each particular case." da Costa, 94 F.4th at 180.

Instead, a district court should view the seven factors above as "relevant data point[s]" that may guide its inquiry. Id. And the factors' use "in guiding factual development" must not "obscure the [court's] ultimate purpose": to make a holistic determination about whether the "child has significant connections demonstrating a secure, stable, and permanent life in his or her new environment." Alcala, 826 F.3d at 171. In other words, the district court may use the factors to develop the record, and after doing so, it must decide whether the constellation of

- 17 -

facts -- viewed in the aggregate -- paints the picture of a child who is settled in the United States.

## B. Applying the Facts to the Standard

With that understanding in mind, we turn to the facts of this case. Silveira contends that the constellation of facts here compels the conclusion that A.R. is "now settled." We agree. When we consider the facts in the record, viewed as a whole, we are left with the firm conviction that A.R. is a settled child.

Consider, for starters, A.R.'s age and the stability of his residence in the United States. At the time of trial, A.R. was ten years old, and since his arrival, he has lived in Lowell, only moving once within the same school district. That means that A.R. has lived in the same community for nearly three years, a significant amount of time in the life of a school-age child. During that time, A.R. has benefitted from a stable home environment with his mother and stepfather. Silveira is a good mother to A.R., and A.R. has a "good" and "healthy" relationship with his stepfather. Moreover, both Silveira and Lucas have steady employment and income which allows them to meet A.R.'s needs. Those facts, standing alone, weigh heavily in favor of finding A.R. to be "now settled."

To be sure, we do not suggest that those facts are dispositive. Rather, they are mere data points. See da Costa, 94 F.4th at 180; cf. da Silva, 953 F.3d at 76 (affirming a not-settled

finding for a child who had lived in and attended public school in Boston for three years because, among other things, the respondent struggled to find steady employment and the child was diagnosed with "adjustment disorder with depression or anxiety").

That is not all there is. A.R. has also benefitted from a supportive and involved extended family. He has a step-aunt and step-uncle who live nearby and who he is intimately familiar with. The couple lived with A.R. for about a year, during which they spent quality time with and cared for him. Despite having moved out, A.R.'s step-uncle and step-aunt remain close with him, continuing to see him twice a month. Both testified that they consider A.R. their nephew and would be willing to support him financially if necessary. What is more, A.R. regularly gathers with Lucas's extended family for holidays and other special occasions.

In addition to stability at home, A.R. has been consistently integrating into the community. Consider first his experience at school. For well over two years, he has consistently attended the same elementary school. True, he exhibited some growing pains adjusting to an in-person school environment in the United States. But, for one thing, that is not surprising. Recall A.R.'s educational starting point. He arrived in the United States having been mostly home-schooled in Brazil and unable to read or write in Portuguese, let alone in English. By the middle of third

grade, though, his teacher testified that A.R. "ha[d] grown in many ways" and "was meeting expectations of the classroom." His progress was such that he became "an interpreter of sorts" for other Brazilian students in his class. Despite some ongoing challenges, A.R. has consistently progressed grade levels and is currently in fourth grade. It is unlikely that such improvement could be made over a fairly short period of time by a child who has not become settled. See Alcala, 826 F.3d at 172.

His activities in the community further support the view that A.R. is settled. Living in the same community has allowed A.R. to participate in activities with other children in and outside of school. In particular, A.R. and his family attend church together twice a month, where A.R. participates in a youth group. A.R. has several friends, too, including many of Brazilian descent. And, three months before the trial, A.R. joined a local soccer team with which he practices twice a week.[9] These facts depict a child who has established a solid foundation in his family and home environment and is gradually, but surely, expanding his horizons. That he did not participate in these activities earlier, and did not participate in more of them at the time of trial, does

---

[9] Although at the time of trial A.R. had only played on the soccer team for three months, "the [Hague] Convention itself gives a strong indication that post-petition evidence remains important." da Costa, 94 F.4th at 182.

not make him unusual for a ten-year-old, especially one in an immigrant family of relatively modest means.

Taken together, these facts, and the record as a whole, compel the conclusion that A.R. is "now settled" in the United States. See da Costa, 94 F.4th at 181. We are aware of no appellate decision in which a child was deemed not to be settled where the child has lived in the same city for several years with a loving, financially stable immediate family; has only moved once, and has never changed schools; has become acclimated to his school environment to a sufficient extent to make substantial educational progress; has an extended step-family nearby who cares for him and whom he sees frequently; and is participating in various community activities of a sort and to an extent typical for a child of his age.[10] Cf. Alcala, 826 F.3d at 172-74 (reviewing settled determination de novo and finding child to be settled where child thrived in school and was supported by a network of family and friends, despite having an unstable home environment, moving households and changing schools three times in two years, and being absent from school a non-trivial number of days); Broca v. Giron, 530 F. App'x 46, 47-48 (2d Cir. 2013) (summary order) (reviewing de novo and finding child to be settled because of his "consistent school attendance, involvement in church, and strong relationships

_____

[10] The parties have not cited such a case and, at oral argument, counsel for the petitioner was unable to provide one.

- 21 -

with friends and relatives in the area, in particular his mother and sister," despite his uncertain "immigration status, lack of residential stability," "poor performance in school," and "his mother's lack of financial stability"); Lomanto v. Agbelusi, No. 23-993, 2024 WL 3342415, at *2 (2d Cir. July 9, 2024) (reviewing de novo and finding children settled where, despite their living in a shelter and having unsettled immigration status, they regularly attended school, were involved in church, and had strong relationships with friends and relatives).

In concluding otherwise, the district court correctly identified and considered the seven factors that we have deemed relevant to the "now settled" decision. That then left the holistic, totality-of-the-circumstances analysis that our precedents require. See da Costa, 94 F.4th at 181. Insofar as the district court undertook that inquiry, it placed emphasis on certain facts -- such as how frequently A.R. saw his extended step-family, his record at school, and how long he had been playing extracurricular soccer. But it is clear that none of those facts, when properly viewed in the context of the entire record, undermines the conclusion that A.R. is settled.

The bottom line is this. The district court "grapple[d] with difficult factual circumstances in which no outcome may [have] appear[ed] ideal." Mendez, 778 F.3d at 347. And, the record showed that A.R.'s life in the United States has not been without

- 22 -

its challenges. A "now settled" child, however, need not have a perfect or flawless life; we ask only if the constellation of facts shows a child with "significant connections demonstrating a secure, stable, and permanent life in his or her new environment." Alcala, 826 F.3d at 171. When viewed together, the constellation of facts here -- A.R.'s age, home life, extended family connections, financial stability, consistent school attendance and improvement, and extracurricular participation -- compels the conclusion that A.R. is such a child. We accordingly vacate.

But that does not end the matter. For the district court retains its "equitable jurisdiction" to decide whether to order A.R.'s return. da Costa, 94 F.4th at 180 (quoting Yaman, 730 F.3d at 21). So, we remand for the district court to decide whether, in the exercise of that equitable discretion, returning A.R. to Brazil is warranted despite his status as "now settled." In conducting that narrow task, the district court "may 'consider [Silveira's] misconduct, [if any,] together with any other relevant circumstances, such as whether return would not be harmful or disruptive even though [A.R.] has become settled.'" Id. (quoting Yaman, 730 F.3d at 21).

## VI. CONCLUSION

For the foregoing reasons, the judgment of the district court is **vacated** and **remanded** for further proceedings in accordance with this opinion. Each party shall bear its own costs.

- 23 -